**COMMISSIONER OF INTERNAL REV-ENUE, Petitioner,**

v.

**Robert Y. MOFFAT, Sr., and Grace S. Moffat, Respondents.**

**No. 15867.**

United States Court of Appeals Third Circuit.

Argued Oct. 31, 1966.

Decided March 6, 1967.

William A. Friedlander, Atty., Dept. of Justice, Tax Div., Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

David B. Buerger, Pittsburgh, Pa. (William Y. Rodewald, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., on the brief), for respondents.

Before GANEY, SMITH and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

GANEY, Circuit Judge.

The Commissioner of Internal Revenue seeks a review of the Tax Court's decision allowing the taxpayer[1] an ordinary deduction of $544,000 as a business bad debt for the year 1960. The issues posed are: (1) Was the taxpayer's leasing of coal lands to a corporation a business within the meaning of the Internal Revenue Code of 1954? And if so, (2) Was his pledging of a future award for the repayment of loans made by the corporation proximately related to that leasing business within the meaning of § 166(d)(2) of that Code?

The underlying facts are not in dispute. In 1953, taxpayer purchased tracts of coal and surface lands and coal mining structures and equipment located thereon in Lackawanna County, Pennsylvania. From that time to September 30, 1957, he engaged in the business of mining and selling coal from these lands as a sole proprietorship under the name Moffat Coal Company. In 1954, the Pennsylvania Turnpike Commission, by right of eminent domain, acquired title and possession of certain portions of that land, estimated to be worth over a million dollars.

In 1955, the taxpayer raised $3,000,000 by borrowing (a) $2,500,000 from a bank secured by a first mortgage on the lands and coal mining structures and equipment, and a security interest in the proceeds to be received by the taxpayer from the condemnation award, and (b) $500,000 from the Glen Alden Coal Company secured by a second mortgage on the same properties set forth under (a) above. In 1956, the Glen Alden Coal Company transferred the second mortgage to taxpayer's son and daughter for $400,000.

In 1957, to reward and retain the services of eighteen key employees by giving them an interest in the business, the taxpayer decided to form a corporation to take over the active operation of mining and selling the coal. On September 30, 1957, he formed the Moffat Coal Company, Inc., and transferred to it all of the structures, equipment, inventories and accounts receivable, but retained title to the lands and the coal reserves thereunder. The value of the assets transferred over the debts relating to that business was $880,000. The corporation issued 88,000 shares of stock in exchange for these assets, 58,000 of which were issued to the taxpayer and the remaining 30,000 were distributed among the eighteen key employees. Each of these employees executed a promissory note to the taxpayer in the amount of $10 for each share of stock received. At all times relevant hereto, the taxpayer was the majority stockholder and chairman of the board of the corporation.

On September 30, 1957, the taxpayer leased the coal lands to the corporation for a term of 51 years, plus such additional time as would be required to remove all the merchantable coal thereunder. In return the corporation agreed to pay all the taxes assessed against the land and a royalty of 50 cents for each ton of coal mined and shipped. The Royalty rate of 50 cents per ton was common in the area at that time. One month later the lease was amended to provide that the royalty would not be payable for any period in which the corporation was unable to meet all of its maturing obligations.

In December of 1957, the corporation borrowed $300,000 on a line of credit from the bank.

On January 2, 1958, taxpayer and his son and daughter organized a partnership under the name of Moffat & Company. The son and daughter contributed the second mortgage to the partnership in return for each receiving a 20% interest in the firm. The taxpayer conveyed to the partnership his title to the coal lands subject to the first and second mortgages. In return he received a 60% interest in the partnership.

---

1. Although a joint income tax return was filed, we refer to the husband as being the taxpayer.

From the time of its incorporation to the end of 1959, the corporation paid $832,790 in royalties.

During 1960, the corporation was unable to make payment on a series of loans, the balance of which amounted to $800,-000, given by the bank. On February 4, 1960, the taxpayer gave his check for $200,000 to the corporation. The latter in turn paid its check in that amount to the bank. The amount was entered in the corporate books as a loan payable to the taxpayer and he was given a demand note. Similar treatment was accorded several other payments made later by him to the corporation in the aggregate of $180,000. Still later in that year, upon demand from the bank, the taxpayer paid the balance of $420,000 on the loans.[2] In this year the partnership, after receiving demand from the local taxing authorities, remitted $422,319 in taxes which the corporation had failed to pay over the years.

No dividend had ever been paid by the corporation and its stock became worthless in 1960. No payments were ever made on any of the notes given by the eighteen key employees and in 1961 they were canceled by the taxpayer and the shares of stock were returned to him.

The total of the payments made by the taxpayer to the bank on behalf of the corporation amounting to $800,000 was claimed by him in his income tax return for 1960 as a deduction for a business bad debt. The Commissioner of Internal Revenue disallowed the entire deduction on the determination that the debt was non-business in character, and since it was partially worthless in 1960, was not deductible in any amount.

The Tax Court found that the taxpayer's pledge and his subsequent payments thereunder were directly related to his owning and leasing of the coal lands to the corporation and therefore

such payments were of a business nature. It also found that the claim against the corporation was partially worthless in 1960 to the extent of $544,000 or 68% of $800,000. As a consequence, the taxpayer was permitted to claim that sum as a deduction for a business bad debt in his income tax return for 1960.

The Commissioner does not dispute that the taxpayer was legally bound to make the payments totaling $800,000 or that the debt arose from those payments and became worthless in the amount of $544,000 in 1960. However, he asserts that in order for this taxpayer to be entitled to a deduction for a business bad debt, he must have shown that he as an individual or the partnership was in a business and that the debt was created or acquired in connection with that business or that the loss resulting from the debt's becoming worthless bore a proximate relation to that business.[3]

In Whipple v. C. I. R., 373 U.S. 193, 203–204, 83 S.Ct. 1168, 1175, 10 L.Ed.2d 288 (1963), the Supreme Court was unwilling to disturb the determinations of the Tax Court, affirmed by the Court of Appeals for the Fifth Circuit, that the taxpayer in that case "was not engaged in the business of money lending, of financing corporations, of bottling soft drinks or any combination of these" since the Court could not say, citing C. I. R. v. Duberstein, 363 U.S. 278, 289–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), that the determinations were clearly erroneous. Additionally, the Court of Appeals for the Third Circuit stated in C. I. R. v. Stokes' Estate, 200 F.2d 637, 638 (1953), "The question whether the activities of a taxpayer constitute carrying on a trade or business is largely one of fact the solution of which 'requires an examination of the facts in each case'. Higgins v. Commissioner [of Internal Revenue], 1941, 312 U.S. 212, 217, 61 S.Ct. 475, 478, 85 L.Ed. 783." Also see

---

2. On July 3, 1960, the award for the land condemned by the Turnpike Commission was made in the amount of $1,195,000. An advance payment against the award had been made in 1959; the balance was paid in full in 1960.

3. See § 1.166–5(b) of Treasury Regulations on Income Tax (1954 Code), 26 C.F.R., § 1.166–5(b).

847

Wineberg v. C. I. R., 326 F.2d 157, 160 (C.A. 9, 1963).

 The Commissioner contends that the taxpayer's activities as lessor of the coal lands did not constitute a "business" within the meaning of the 1954 Revenue Code. We cannot say that the Tax Court's determination is clearly erroneous. As to the finding that the taxpayer's guaranteeing of the corporation's repayment of loans as well as his payment of the indebtedness in 1960 arising from the loans were "not only proximately but directly related" to the taxpayer's leasing business, there was substantial evidence to support such finding. The president of the corporation who was in charge of the coal mining operations testified that following the organization of the corporation, the taxpayer spent seventy-five per cent of his time on the coal lands and from the questions he asked about the property, the president knew that he was talking to the taxpayer as the owner of the property. The secretary of the company likewise testified that the taxpayer devoted most of his time to the business of leasing and operating coal properties which was his partnership business.

In the alternative, the Commissioner argues that it is not possible for an appellate court to determine whether the Tax Court applied the correct legal standard under § 166(d) (2) of the 1954 Revenue Code in evaluating the factual evidence. Concerning the crucial issues, the Tax Court stated in its opinion:

"The evidence clearly shows, however, that [the taxpayer] was very actively and constantly engaged in the business of owning, leasing *and seeing to the proper operation* of his coal

lands at all times material hereto, first as sole owner and later as a 60 per cent partner in Moffat & Company. His guarantee of the [corporation] borrowing as well as his payment of the indebtedness in 1960 were not only proximately but directly related to *that business* * * *." (Emphasis supplied.)

The insertion of the words "and seeing to the proper operation" was perhaps unfortunate.[4] However, the intention of the Tax Court is eminently clear from a reading of its opinion. The words "that business" refers to the business of owning and leasing of the coal lands, not to "seeing to the proper operation" of the coal lands.

The decision of the Tax Court will be affirmed.

4. See Walter v. Dunlap et al., 368 F.2d 118, 120 (C.A.3, 1966), where Judge Hastie made the following observation: " * * * In common parlance and understanding, after the space in a commercial building has been rented to tenants, the structure is described and viewed as being used in the business of the tenants and not in the business of the landlord. It is the leasing of property to produce income rather than the use made of it while rented which constitutes the lessor's business. Any control the lessor may reserve over the premises and any employment of a building superintendent and staff are for the maintenance and protection of his property and do not constitute a proprietary involvement in the current use of the building."