Irving Ninberg and Ida Ninberg v. Commissioner. Ben Ninberg and Mollie Ninberg v. Commissioner.
Ninberg v. Commissioner
Docket Nos. 6035-64, 6036-64.
United States Tax Court
T.C. Memo 1967-109; 1967 Tax Ct. Memo LEXIS 150; 26 T.C.M. (CCH) 512; T.C.M. (RIA) 67109; May 15, 1967
Bruce I. Hochman and Harvey D. Tack, for the petitioners. Wesley A. Dierberger, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes for the years 1959 and 1962 as follows: Docket
No.
Petitioners
1959
1962
6035-64
Irving and Ida
Ninberg
$5,012.74
$1,726.51
6036-64
Ben and Mollie
Ninberg
6,365.71
396.30 The only issue for determination is whether the amount of petitioners' payment of bank loans of their wholly-owned corporation pursuant to their personal guarantee thereof is deductible as a business or a nonbusiness bad debt. The deficiencies in the year 1959 result from a claimed carryback of net operating losses from 1962. Findings of Fact Some of the facts have been stipulated and are found accordingly. Irving and Ida Ninberg, husband and wife who resided in Los Angeles, California, at the time of the filing of their petition in this case, filed *152 joint Federal income tax returns for the calendar years 1959, 1960, 1961 and 1962 with the district director of internal revenue at Los Angeles, California. Ben and Mollie Ninberg, husband and wife, residing in Van Nuys, California, filed joint Federal income tax returns for the calendar years 1959, 1960, 1961, and 1962 with the district director of internal revenue at Los Angeles, California. Petitioners Irving and Ben Ninberg (hereinafter referred to as Irving and Ben) are brothers. A partnership return of income for each of the calendar years 1961 and 1962 in the name of "Irving and Ben Ninberg" was filed stating the principal business activity of the partnership to be "Rentals" and showing the date "business commenced" to be October 15, 1959. These returns showed Irving and Ben as each having a 50 percent share of the income, credits and deductions of the partnership. Each of the partnership returns showed as an asset a building acquired October 1, 1959, which was the building located at 3000 North San Fernando Blvd., Burbank, California (referred to hereinafter as the San Fernando building), which was rented to Bur-Val Manufacturing Co. (hereinafter referred to as Bur-Val). *153 Bur-Val was incorporated on May 6, 1957. Its original capital was $25,000 and its common stock was issued 50 percent each to Irving and Ben who became officers and full-time employees of Bur-Val. Bur-Val never paid dividends. It was engaged in the business of manufacturing aluminumsash windows and glass doors. Irving and Ben had been in business together prior to the incorporation of Bur-Val, but Bur-Val was not successor to the earlier business. Bur-Val filed its corporate income tax returns on the basis of a fiscal-year ending April 30. Irving was president of Bur-Val and was in charge of office and sales personnel. Ben held the office of secretary in the corporation and was in charge of production. During its fiscal years 1960 through 1963, Bur-Val had gross sales and taxable income as follows: Fiscal Year Ending April 30
1960
1961
1962
1963
Gross Sales
$2,014,673
$1,848,607
$1,922,200 *
$1,567,704
Taxable Income
30,260
(73,751)
16,759
(115,693) The balance sheets filed with the corporate *154 income tax returns show the capital stock and earned surplus of the corporation to be as follows at the end of the years indicated: 1959
1960
1961
1962
1963
Capital stock
$25,000
$25,000
$25,000
$25,000
$ 25,000
Earned surplus
22,736
43,076
(9,031)
4,623
(111,070)
The business of Bur-Val was carried on at 1012 North Lake Street, Burbank, from its inception until it moved to the San Fernando building in 1959. The move was made because the North Lake Street property was too small. Irving and Ben owned the property on North Lake Street and rented it to Bur-Val for about $400 a month. Bur-Val occupied the San Fernando building prior to its purchase by petitioners under a sublease, paying $1,500 rent per month to the sublessor although that sublessor was paying $3,500 per month rent to the owner of the property. Petitioners purchased the San Fernando building and land in October 1959 for $255,000 and leased it to Bur-Val for $3,000 a month on a 5-year lease. Petitioners paid $55,000 down at the time of the purchase and agreed to pay $2,500 per month for three years, at which time the balance would become due. The interest rate was 6 1/2 percent. *155 Petitioners improved the building by installing new electrical wiring and rebuilding the air compressor. Irving had some interest in two other rental properties between 1959 and 1962. Petitioners reported rental income from the San Fernando building directly on their individual returns for 1959, but reported it as partnership income distributable to them in 1960 and 1961. The partnership returns for 1961 and 1962 reported gross rentals of $40,800 and $26,050. Bur-Val had difficulty paying its rent in its fiscal year ended April 30, 1962, and did not make all payments due. Petitioners made all mortgage payments as they fell due and subsequently received, from Bur-Val's trustee in bankruptcy, payments on their claims for unpaid rent. Petitioners reported income from all sources as follows for 1959 through 1962: 1959
1960
1961
1962
Irving and Ida Ninberg
Salary - Bur-Val
$34,500.00
$34,500.00
$ 1,118.00
Rental from San Fernando bldg.
(or partnership)
1,400.60
9,770.88
$ 6,204.49
(18,806.74)
Dividends, less exclusion
5.52
56.32
460.48
786.21
Interest
1,471.97
1,737.04
2,603.53
2,784.46
Other partnerships [1]
1,582.22
3,534.26
3,828.35
3,470.91
Ben and Mollie Ninberg
Salary - Bur-Val
$34,500.00
$34,500.00
$ 800.00
Rental from San Fernando bldg.
(or partnership)
1,400.60
9,770.87
$ 6,204.49
(18,806.75)
Dividends, less exclusion
30.20
342.60
Other
883.97
*156 When Bur-Val commenced business it began borrowing small amounts from the Bank of America and giving short-term notes for the loans which Irving and Ben personally guaranteed. It was customary for the Bank of America to require personal endorsements on such short-term notes. As Bur-Val's business increased its borrowing from the Bank of America on short-term notes guaranteed by Irving and Ben became larger. In 1961 Bur-Val's borrowing from the Bank of America was getting quite large and the bank wanted more security than just the personal guarantee of Irving and Ben for the amount of money it was lending to Bur-Val. The Bank of America required collateral for its loans to Bur-Val and its stockholders, the petitioners. Petitioners cosigned Bur-Val's note to the Bank of America and pledged the following securities: Stock: City National Bank, General Telephone, Harvey Aluminum, Lear Siegler, Inc. Savings Account #3-2327 Savings Account of Ben and Mollie Ninberg. The stocks were owned approximately equally by Ben and Irving. In August 1961, petitioners guaranteed obligations of Bur-Val to Harvey Aluminum Co., its supplier *157 of aluminum, to the extent of their equity in the North Lake Street and San Fernando buildings. Harvey Aluminum required the guarantee "because of the weakness of the entire industry." At the time Harvey Aluminum demanded the guarantee and the bank required collateral in 1961, Ben and Irving were anticipating a need to refinance the San Fernando property because the final lump sum payment would be due in October 1962. Petitioners were unsuccessful in arranging a refinancing and in October 1962 petitioners obtained a one-year extension of the due date of the remaining balance on the purchase money mortgage. On October 24, 1962, Harvey Aluminum brought suit in the Superior Court of Los Angeles against Bur-Val and petitioners for the sum of $85,094.94 for and on account of goods, wares and merchandise manufactured for Bur-Val. Bur-Val had been unable to meet current expenses because it was "involved with a factor which had gotten into trouble" and all Bur-Val's funds were cut off for about 60 days, during which time it had no funds to pay bills, including payroll. Harvey Aluminum ultimately acquired the San Fernando building in settlement of this suit. In 1962 the Bank of America *158 sold the stock and took the other collateral pledged on Bur-Val's note which was cosigned by petitioners realizing the following amounts: Stock: City National Bank
$ 2,456.06 [1]
General Telephone
8,581.34
Harvey Aluminum
7,331.72
Lear Siegler, Inc.
843.30
Total Stock
$19,212.42
Savings Account #3-2327
18,028.46
Saving Account of Ben and Mollie
Ninberg
6,369.43
Check and Cash from Irving Nin-
berg
87.58
$43,697.89
Sometime in 1962, Bur-Val filed a petition under Chapter 11 of the Bankruptcy Law, and a trustee was appointed to manage the business. Irving and Ben continued to operate the business with the trustee. Later, another aluminum door and window manufacturer became involved in the operation of the business, but in February 1963 the other company withdrew. The trustee instructed Irving and Ben to refinance, which they could not do. They liquidated Bur-Val by selling its assets to Harvey Aluminum which formed a new corporation to operate the *159 business. Ben Ninberg was employed by the new concern and owned a 10 percent stock interest in it from November 1963 to August 1966. A deduction was claimed on the partnerreturn for 1962 for "Bad Debts - Bur-Val Mfg. Co." in the amount of $44,094.02, which produced a partnership operating loss of $37,613.49 for that year. Each of the partners reported one-half of the loss, $18,806.74, on his individual income tax return. On June 20, 1963, petitioners each filed an application for a tentative carryback adjustment of a net operating loss for 1962 to be carried back to 1959 with the district director of internal revenue, Los Angeles, California, and the claimed carrybacks were allowed. In accordance with the allowance of the claimed carryback adjustments refunds of tax paid for the year 1959 were made on August 20, 1963 to Irving and Ida Ninberg and Ben and Mollie Ninberg in the amounts of $5,012.74 and $6,365.71, respectively. Respondent, in his notices of deficiency to petitioners, determined that the net operating loss and loss carryback was not allowable because - [The] deduction of $44,094.02 claimed as a business bad debt resulting from the satisfaction of your guarantee *160 of certain loans payable of the Bur-Val Manufacturing Co., is disallowed. It is determined that the substantiated loss in the amount of $43,697.89 constitutes a non-business bad debt that is deductible as a short-term capital loss. Respondent determined, also, that the partnership's corrected ordinary net income for the year 1962 was $6,480.53; that each partner, having claimed a loss for the year of $18,806.74, had understated his income for the year in the amount of $22,047.01. Opinion Both parties recognize that petitioners had a bad debt loss in 1962. Putnam v. Commissioner, 352 U.S. 82 (1956). The issue between them is whether that loss was from the worthlessness of a business or nonbusiness bad debt. Petitioners contend that their guarantee of the loan by the Bank of America to Bur-Val was proximately related to their individual businesses of renting property and of rendering services for pay, and that the loss sustained from satisfaction of the guarantee is therefore fully deductible as a business bad debt under section 166(a)(1) of the Internal Revenue Code of 1954. [2] Respondent takes the position that the bad debt resulting from *161 the satisfaction by petitioners of Bur-Val's loan made by them as guarantors is a nonbusiness bad debt the loss from which is a short-term capital loss under section 166(d)(1)(B). A bad debt arising from a loan by stockholders to their closely-held corporation, or payment by stockholders of a guarantee of their closely-held corporation's debt, is usually deductible only as a nonbusiness bad debt. Section 166(d)(2) defines nonbusiness bad debt as one not incurred in, or the loss from which does not arise in connection with, a trade or business of the taxpayer. A stockholder and the corporation the stock of which he owns are separate entities and the business of the corporation is not the stockholder's business. If the taxpayer suffering the bad dabt loss is a stockholder whose loss arises from a loan to his corporation or payment as guarantor of the debts of his corporation in order for the debt to be a business *162 bad debt of such taxpayer, the debt must have a business relationship to the stockholder's personal business and not merely to the corporate business. Whipple v. Commissioner, 373 U.S. 193 (1961). Investment activities, no matter how extensive, are not a trade or business. Higgins v. Commissioner, 312 U.S. 212 (1941). Therefore, extension of credit by an investor to protect his investment is not in connection with a trade or business. The deduction permitted under section 212 of expenses incurred in the "management, conservation or maintenance of property for the production of income" does not encompass a bad debt since section 166(d)(1) deals specifically with bad debts and the specific and not the general provision controls. Putnam v. Commissioner, supra. Even though the trade or business of a corporation cannot be considered the personal trade or business of its officers or stockholders, there are circumstances under which a loan made by a stockholder to his corporation or the payment by a stockholder of a debt of his corporation which he has guaranteed is so related to an individual trade or business of the stockholder separate from *163 the corporate business, that the debt is a business debt and any loss arising therefrom is a loss from the worthlessness of a business bad debt. The existence of such a relationship was the basis of the holding in the Circuit Court in Trent v. Commissioner, 291 F. 2d 669 (C.A. 2, 1961), reversing 34 T.C. 910, and the lack of such relationship the basis of our holding in George P. Weddle, 39 T.C. 493, aff'd, 325 F. 2d 849 (C.A. 2, 1963); I Hall Millsap, Jr., 46 T.C. 751 (1966), on appeal (C.A. 8, Feb. 17, 1967); and Max M. Barish, 31 T.C. 1280 (1959). The question of whether a loan was made by a taxpayer-stockholder as an investor or in pursuit of a business of his separate from the corporate business is one of fact. In the instant case the worthless debt with which we are concerned is that which arose because of the payment by petitioners of their guarantee of a bank loan of their corporation which had arisen by the routine borrowing of amounts for working capital by that corporation from the bank from the beginning of the corporate business. From the time the corporation commenced business it had borrowed *164 from the bank giving notes guaranteed by petitioners. The loss arose because of petitioners' having to satisfy this guarantee. This factual situation so strongly indicates that the debt was related only to the corporate business and had no connection with any personal business of petitioners, as to cause the issue between the parties concerning the reason why petitioners furnished collateral to the bank for the loan in 1961 to be almost irrelevant. The unmistakable inference from the record is that the only alternatives which petitioners had in 1961 were to pay the corporate debt, put up the collateral required by the bank or have the corporation pay the debt. How the corporation would have acquired funds to pay the debt when about this time it was having difficulty meeting its bills for materials and payroll or, if it had used funds to pay the bank, from what source it would have continued to obtain any working capital is not shown. The reasonable inference is that the corporation could not have paid its indebtedness to the bank, made no further bank loans and continued in business. Had the corporation ceased business petitioners would have lost their investment, their employment *165 by the corporation and the corporation as a tenant for their building. However, petitioners had commenced their guarantee of the loans when the corporation began business and they did not know to what extent it would be able to pay salaries to them and it was the tenant of another building of petitioners. So far as the record shows petitioners would have been able to obtain more highly remunerative employment and a higher rent for the San Fernando building from another business than they were obtaining from Bur-Val. However, the only way for petitioners to protect their investment in Bur-Val was by either paying its bank loan themselves or putting up the collateral demanded by the bank. Since there would be no advantage to petitioners to pay the loan themselves, they took the obvious course necessary to protect their investment and put up the collateral demanded by the bank. Irving after pointing out in his testimony the circumstances which caused the bank to demand collateral for the ordinary working capital loan it had made to Bur-Val with the gurarantee of its two stockholder officers stated "and we figured that we would guaranty the amount due to the fact that we would have a *166 tenant that would be in the property at all times." Ben's testimony with respect to the reason for putting up the collateral to the Bank of America was: We discussed it in brief, and we had to have working capital. So for the benefit of our tenant, we worked it out so that there would be working money. Since Bur-Val was the tenant in petitioner's building, it is obvious that putting up the collateral was for the benefit of petitioners' tenant but the only benefit shown by this record in putting up the collateral to petitioners as distinguished from Bur-Val was to keep Bur-Val operating and protect their investment in Bur-Val. Our conclusion that we do not believe the self-serving statements of petitioners (if these statements can be so interpreted as petitioners on brief argue they can) that they put up collateral for Bur-Val's loan with the Bank of America in 1961 to further their business of renting the San Fernando building by keeping a tenant in that building in substance disposes of this case, since there is nothing in the record to give support to petitioners' argument that the collateral was put up to protect petitioners' "trade or business" of being a corporate employee. *167 However, since the parties in their briefs argue a number of other points, we will further consider their various arguments. Section 1.166-5(b)(2), Income Tax Regulations, provides that: The character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception * * *. Petitioners have the burden to prove that they were individually engaged in a trade or business and that their guarantee and the loss arising from it were proximately related to such trade or business. Petitioners' efforts to establish proximate relationship are directed entirely to sometime in 1961 when the bank required collateral and they cosigned Bur-Val's note and put up security. Respondent disputes petitioners' contention that the guarantee was proximately related to any trade or business of rendering services or of renting property. In determining whether the requisite "proximate relationship" exists, *168 the courts invariably search for the motive of the shareholder in making the loan or guaranteeing the debt, and they glean this from a consideration not only of expressed subjective intent but also of external objective facts. See Kelly v. Patterson, 331 F. 2d 753, (C.A. 5, 1964) and George P. Weddle, supra, in both of which the court weighed against the expressed intent such factors as percentage ownership of the corporation by the stockholder-guarantor, the value of the taxpayer's equity in the corporation, the value of salary received, and the ratio between the size of the loan, equity and any other interest which might have influenced the taxpayer's action. The courts look beyond motive, however, in searching for "proximate relationship." Intentions alone cannot make a bona fide business expense out of an item which is not necessary to the conduct of the business. Therefore, the courts have looked to see if the loan to the corporation was required of the shareholder if he seeks to justify it by his employment status. Even though a stockholder is not actually required to make the loan by the needs of his personal business, a fairly direct and clearly beneficial *169 effect on his personal business interest has been held to cause the bad debt to be considered to be a business bad debt. Compare Main v. United States, an unreported case ( W.D. Wash. 1966, 18 A.F.T.R. 2d 5601), with United States v. Keeler, 308 F. 2d 424 (C.A. 9, 1962), certiorari denied 373 U.S. 932. The testimony of petitioners was that, primarily, they meant to safeguard their equity in the San Fernando building when they put up collateral and signed the note in 1961. Although the evidence is not clear on this point, it appears that their equity in the building substantially exceeded their equity in the corporation. Nevertheless, other factors indicate that petitioners' expressed intent was not their real intent. Petitioners placed their equity in the building at the risk of Bur-Val's business by using it to secure a supply of materials for Bur-Val. Furthermore, the record shows that beginning sometime in 1961, Bur-Val was not paying rent when it fell due. Such a tenant would hardly be well regarded by a prospective financier and it is difficult to accept petitioners' contention that the retention of Bur-Val as a tenant would ease their *170 refinancing effort. Petitioners' interest in the building would have been better safeguarded with another tenant. Since petitioners habitually guaranteed Bur-Val's loans, it is unlikely that any fresh thought was given to the repetitive act in 1961. Petitioners' argument that the guarantee was connected with continued receipt of their salaries is unpersuasive. They withdrew large salaries for two years and then none at all when the corporation's business was less profitable. Thus, they also sacrificed this noninvestor's return to the welfare of the corporation. Petitioners have not shown that they would have been unable to find another tenant or other comparable jobs, or that they attempted to do so. As we noted above, it is not demanded that petitioners establish absolute necessity to support the deduction, but they have not shown either that their rental business or their employment status would be clearly benefitted by the guarantee. Petitioners' investment, salary and rental interests were thoroughly intermingled but the business of Bur-Val and their investment therein was their major concern. When Bur-Val's business was threatened in 1961, they intensified their efforts for *171 the welfare of the corporation. This effort was directed to the corporation which was at the center of their interests. It was not required by the "other" business. Its effect would not even be directly beneficial to the "other" businesses. Petitioners strongly urged that there need only be a "significant motivation" and not a "primary motivation" to support business bad debt characterization of a loan to a controlled corporation, citing the Circuit Court opinion and concurring opinion in George P. Weddle, supra. As noted above, motivation is not the sole factor to be considered. Section 1.166-5(b)(2), Income Tax Regulations, speaks of proximate relationship. The Supreme Court in the Whipple case, says of the predecessor of section 166, section 23(k), I.R.C. 1939, that It was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax law recognized as a trade or business, a concept which falls far short of reaching every income or profit-making activity. (373 U.S. 193, 201) (Emphasis supplied) In seeking this "proximate connection," we must examine factors other than motivation, *172 particularly those which illustrate the degree of necessity and directness of effect of the loan to the corporation upon the taxpayer's other business. Not only have we found lack of necessity and directness of effect, but also, we have found other objective factors which negate petitioners' expression of intent. Thus, petitioners have not proved that they were either "significantly" or "primarily" motivated by their other business. Petitioners contend that Robert Y. Moffat, 373 F. 2d 844 (C.A. 3, 1967) affirming a memorandum opinion of this Court and Maloney v. Spencer, 172 F. 2d 638 (C.A. 9, 1949), in both of which the taxpayers were allowed a business bad debt deduction on loans made to closely-held corporations, support their position in the instant case. In both cases the taxpayers leased property to the corporations. However, the facts in those two cases are very different from those in the instant case. In Maloney v. Spencer the taxpayer incorporated his food processing business in three corporations. He owned the plant buildings and equipment himself and agreed as lessor in the lease contracts to provide adequate financing through guarantee and *173 pledge. The facts showed that the taxpayer spent at least one-third of his time in connection with his business of leasing buildings. The taxpayer in the Moffat case carried on mining operations on his own lands before he incorporated the mining operations. He retained the coal lands and leased them to the corporations. The liabilities of the corporation which the taxpayer paid were encumbrances on the coal lands, dating back to the time of the sole proprietorship. This and other factors substantially differentiate Moffat from the present case. In the instant case we have concluded from all the evidence that petitioners guaranteed the note of Bur-Val as stockholders protecting their investment in the corporation. Because of adjustments made by respondent in the notices of deficiency which are not in issue in this case, Decisions will be entered under Rule 50. Footnotes
*. Gross sales is illegibile on the copy of the return which is an exhibit in this case. This figure is gross sales less returns and allowances.↩
1. Irving received this income from two partnerships.↩
1. This figure was stipulated as $3,456.06, but that was obviously a typographical error, as it renders the sums erroneous. Also, the partnership returns showed $2,456.06 as the amount realized.↩
2. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. Section 166(a)(1) provides: (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year.↩