JACK G. GOSS and JEANNE P. GOSS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goss v. Commissioner
Docket No. 1258-76.
United States Tax Court
T.C. Memo 1977-338; 1977 Tax Ct. Memo LEXIS 105; 36 T.C.M. (CCH) 1353; T.C.M. (RIA) 770338; September 27, 1977, Filed Jack G. Goss, pro se. Karl D. Zufelt, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1969 and 1973 in the amounts of $6,256 and $1,467, respectively. [1]
*106 The issues for decision are: (1) Whether petitioners are entitled to a business bad debt deduction undr section 166(f), I.R.C. 1954, [2] for amounts they paid in 1972 and 1973 as guarantors of a loan made by a bank to Scott Rehart; and (2) in the alternative, if petitioners are not entitled to the business bad debt deductions pursuant to the provisions of section 166(f), are they entitled to these deductions under section 166(a) and (d) as losses from the worthlessness of a debt incurred in petitioners' trade or business. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Arcadia, California, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1969, 1972 and 1973. Petitioners on their 1972 return reported a net loss and filed with that return an Application for Tentative Refund From Carryback of Net Operating Loss from the year 1972 to the year 1969 (Form 1045). Prior to 1969 Jack Goss (hereinafter referred *107 to as petitioner) was a securities salesman and an officer of a brokerage firm which held a seat on the New York Stock Exchange. After serving as a salesman and a vice president for that brokerage firm for 4 years, petitioner became president and chief executive officer of that firm before leaving it to form a corporation known as Goss, Rehart & Co., Inc. Petitioner also owned an interest in the firm he left, which was approximately 12 percent at the time he left. For the year 1968 petitioner received a salary of $3,000 a month from the firm by which he was employed and in addition, in that year, received commissions of over $100,000. Petitioner, with an associate, Scott Rehart, formed a stock brokerage firm which was incorporated in November 1968 under the name Goss, Rehart & Co., Inc. This brokerage firm became a registered broker-dealer with the Securities and Exchange Commission on January 22, 1969. Petitioner contributed $114,000 to Goss, Rehart & Co., Inc. and received 57 percent of its stock. Scott Rehart contributed $86,000 to that corporation and received 43 percent of its stock. The $200,000 capitalization of Goss, Rehart & Co., was well above the minimum requirement *108 of the Securities and Exchange Commission. Throughout the life of the corporation, petitioner and Mr. Rehart remained the only stockholders, and no additional equity was contributed to the corporation. Neither of petitioners is related to Mr. Rehart. Scott Rehart was 28 years old in 1968 and had been employed for 4 years as a salesman active in trading over-the-counter securities. Of the $86,000 contributed by Mr. Rehart, $53,000 came from the proceeds of a loan made by United California Bank to Mr. Rehart. This loan was guaranteed by both Jack and Jeanne Goss. Petitioners guaranteed the loan in order to enable Mr. Rehart to contribute the $53,000 proceeds of the loan toward the purchase of stock of Goss, Rehart & Co., Inc. Goss, Rehart & Co., Inc. purchased a seat on the Pacific Coast Stock Exchange for approximately $58,000, which seat was held in the name of petitioner as broker. This purchase, as well as amounts expended for rent, furniture, equipment, and initial operating expenses, came from the initial $200,000 capital investment made by petitioner and Mr. Rehart in Goss, Rehart & Co., Inc. During the period January 22, 1969, to June 12, 1970, petitioner and Mr. *109 Rehart were both employed by Goss, Rehart & Co., Inc. and each of them devoted substantially his full time to the business of that corporation. During this period the compensation received by petitioner represented substantially all of his earned gross income and the compensation received from that corporation by Mr. Rehart represented substantially all of his earned gross income. Petitioner served as chief executive of the corporation as well as its manager and one of its securities salesman. Mr. Rehart was a vice president of the corporation and a securities salesman specializing in over-the-counter trading. Mr. Goss had a much larger clientele in the brokerage field than did Mr. Rehart. Mr. Rehart's primary asset to a brokerage firm was his expertise in the field of over-the-counter trading. Of the original capital contributed to Goss, Rehart & Co., Inc., approximately $53,000 was used to purchase over-the-counter securities for the firm. With the use of this $53,000, the firm was able to carry over-the-counter securities having a total market value of approximately $176,000. While a securities company can function without an active over-the-counter trading activity, a firm *110 with capital to invest in such an activity can get the benefit of better prices for its clients in the over-the-counter market since such a firm can buy over-the-counter stocks at the bid price and sell at the offer price. Neither petitioner nor Mr. Rehart had an employment contract with Goss, Rehart & Co., Inc. However, they had an agreement that Mr. Goss received 50 percent of the corporation's commissions on transactions which he handled and Mr. Rehart received 50 percent of the commissions on transactions which he handled involving securities listed on the New York Stock Exchange and 35 percent of such commissions on over-the-counter transactions. During 1969 petitioner earned $46,723 in commissions from Goss, Rehart & Co., Inc. In the first few months of its existence, Goss, Rehart & Co., Inc. hired 2 securities salesmen in addition to petitioner and Mr. Rehart and hired 8 clerical employees. In the latter part of 1969, Goss, Rehart & Co., Inc. employed 6 or 7 securities salesmen in addition to petitioner and Mr. Rehart. After incurring financial losses, Goss, Rehart & Co., Inc. voluntarily suspended activities on June 10, 1970. On June 12, 1970, at the request of the *111 Securities and Exchange Commission, a United States District Court enjoined the firm from doing business while insolvent and appointed a receiver. Goss, Rehart & Co., Inc. did not pay any dividends during its existence. The $53,000 loan from United California Bank to Mr. Rehart was Mr. Rehart's personal noncorporate obligation. Mr. Rehart failed to pay installments which became due on this loan in 1972 and 1973, and in partial discharge of their obligation as guarantors of Mr. Rehart's loan, petitioners paid United California Bank $9,162 in 1972 and $10,182 in 1973. At the time petitioners paid these amounts as required by the loan guaranty, the obligation of Mr. Rehart to repay United California Bank (without regard to the guaranty) was worthless. The amount of $9,162 paid by petitioners in 1972 as guarantors of Mr. Rehart's loan was claimed by them as a business bad debt deduction on their Federal income tax return for that year resulting in a net operating loss carryback deduction of $9,162 to the year 1969. The $10,182 paid by petitioners in 1973 as guarantors of Mr. Rehart's loan was claimed by them as a business bad debt deduction for that year on their Federal income *112 tax return. Respondent, in his notice of deficiency, determined that the deductions of $9,162 and $10,182 (incorrectly stated in the notice of deficiency as $10,180) claimed by petitioners for the years 1972 and 1973, respectively, were not allowable because "it has not been established that these are business bad debts within the purview of Section 166 of the Internal Revenue Code." In his computation of the deficiency for the year 1969 set forth in the notice of deficiency, respondent reduced the "net operating loss carryback from 1972 allowed" by the $9,162 business bad debt claimed by petitioners for the year 1972 which he had determined was not allowable for the year 1972 as a business bad debt. OPINION As applicable to the years here in issue, section 166(a) provides for the allowance as a deduction of any debt which becomes worthless within the taxable year, and section 166(d) provides that section 166(a) shall in the case of a taxpayer other than a corporation not apply to any nonbusiness debt. However, section 166(f) provides that the payment by a taxpayer other than a corporation in discharge of his obligation as a guarantor of a noncorporate *113 obligation, the proceeds of which were used in the trade or business of the borrower, shall be treated as a business debt becoming worthless within the taxable year, if at the time the payment was made by the guarantor, the obligation of the borrower to the person who made him the loan was worthless without regard to the guaranty. [3]
*114 Petitioners' primary contention in this case is that they are entitled to a deduction in each of the years here in issue for the payment they made in discharge of their guaranty obligation of Mr. Rehart's loan under section 166(f). They contend that the obligation was a noncorporate obligation in that it was Mr. Rehart's personal obligation, that Mr. Rehart used the proceeds of the loan in his trade or business, and that when petitioners made their payment under their guaranty, the obligation of Mr. Rehart to the bank was worthless without regard to petitioners' guaranty. Respondent agrees with petitioners that they made a payment as guarantors on Mr. Rehart's indebtedness, that the payment was made on a noncorporate obligation, and that Mr. Rehart's obligation to the bank without regard to petitioners' guaranty of the loan was worthless at the time petitioners made payments under their obligation as guarantors. The sole issue between the parties with respect to the application of section 166(f) is whether the proceeds of the loan from United California Bank to Mr. Rehart were used "in the trade or business of the borrower [Mr. Rehart]." Petitioner argues that Goss, Rehart & *115 Co., Inc. would not have had an active over-the-counter trading of stocks business had the proceeds of the loan to Mr. Rehart from United California Bank not been placed in the corporation for this purpose. Petitioners state that it follows that the services of Mr. Rehart would not have been necessary to or needed by Goss, Rehart & Co., Inc. had Mr. Rehart not borrowed the $53,000 to finance the corporation's over-the-counter trading. From this petitioners conclude that the proceeds of the loan from United California Bank to Mr. Rehart were used in Mr. Rehart's business of being an employee of Goss, Rehart & Co., Inc. and, therefore, section 166(f) is applicable to the loan. In our view the record is deficient to support petitioners' primary assumptions that without the proceeds of the loan Goss, Rehart & Co., Inc. would not have engaged in over-the-counter trading and Mr. Rehart's services would not have been necessary to or needed by the corporation. However, even if we accepted petitioners' conclusions in these respects, it would not, in our opinion, follow that the proceeds of the loan were used by Mr. Rehart in his business of being an employee of Goss, Rehart & Co., Inc. *116 The only evidence to support petitioners' primary conclusions is the following testimony of Mr. Goss: * * * Rehart's clientele was tiny and provided less than 10% of his income, prior to and at, Goss, Rehart and Company, Incorporated. Rehart's main value to Goss, Rehart and Company was as an over the counter trader. The $53,000.00 he contributed to Goss, Rehart and Company, Incorporated from loan proceeds, guaranteed by Goss, both Mr. and Mrs., was earmarked before and after commitment for over the counter trading of stocks activity, and that sum allowed Goss, Rehart and Company, Incorporated to carry overnight stock ownership positions of some one hundred seventy six thousand odd dollars of market value. Without Rehart's capital contribution, there would not have been an active over the counter stock trading activity and Mr. Rehart would not have been necessary to or needed by Goss, Rehart and Company, Incorporated. Therefore, the company would have functioned without an active over the counter trading activity as many securities firms do. The testimony of Mr. Goss that "[without] Rehart's capital contribution, there would not have been an active over the counter stock *117 trading activity and Mr. Rehart would not have been necessary or needed by Goss Rehart and Company, Incorporated" is a conclusion or opinion of Mr. Goss' which is not supported by other facts in this record. The evidence here shows that, aside from the proceeds of the $53,000 loan, Mr. Rehart had contributed $33,000 for stock of Goss, Rehart & Co., Inc. The record does not show the exact usage of the $147,000 of capital paid in for stock by petitioner and Mr. Rehart, aside from the proceeds of the $53,000 loan, other than the use of $58,000 to purchase a seat on the Pacific Coast Stock Exchange. Therefore, on the basis of this record, Goss, Rehart & Co., Inc. would have had the portion of the $89,000 of paid-in capital not used to purchase the seat on the Pacific Coast Stock Exchange which it did not use for furniture, equipment and initial operating expenses to finance over-the-counter trading, even had the $53,000 proceeds of the loan to Mr. Rehart not been invested in the corporation. Amounts expended for such items as furniture, equipment and initial operating expenses are flexible. We do not doubt petitioner's testimony that he and Mr. Rehart agreed that $53,000 would be *118 used to finance the over-the-counter activities of Goss, Rehart & Co., Inc. and that when Mr. Rehart negotiated the loan they had this agreement. Nevertheless, for the reasons we have set forth above, it does not follow that, absent Mr. Rehart's receiving the loan, Goss, Rehart & Co., Inc. would not have engaged in over-the-counter activities or that Mr. Rehart would not have been employed by Goss, Rehart & Co., Inc. However, even if these facts were established, petitioner's conclusion that the $53,000 was used in the trade or business of Mr. Rehart would not follow. The $53,000 was used by Mr. Rehart to purchase stock of Goss, Rehart & Co., Inc. That corporation used $53,000 of its capital in its over-the-counter market activities. The business of the corporation is distinct from Mr. Rehart's business of being an officer and employee of the corporation. See Trent v. Commissioner,291 F.2d 669 (2d Cir. 1961), revg. 34 T.C. 910 (1960). Certainly, this record shows that the corporate business was enhanced by the $53,000 of its capital used in over-the-counter trading. The corporation retained 65 percent of the commissions received on over-the-counter *119 transactions and Mr. Rehart, for his services to the corporation, received only 35 percent of those commissions. As petitioner's testimony itself shows, the corporation not only got the benefit of 65 percent of the commissions earned on the over-the-counter transactions, but also got other benefits from these transactions. Petitioner testified in this regard: With the additional $53,000.00 capital, my clientele got the benefit of better prices in the over the counter market, as we could buy them at bid and sell on the offer, instead of the other way around. Thus, enhancing my reputation as a broker who got good prices for his clients and did a large and profitable business. Properly interpreted, this testimony establishes that the customers of Goss, Rehart & Co., Inc. got the benefit of better prices in the over-the-counter market with the $53,000 capital used in connection with that activity of the corporation. Certainly, while the obtaining of better prices might enhance the reputation of any officer or employee of Goss, Rehart & Co., Inc., it would likewise enhance the corporate reputation. Since Mr. Rehart did not testify in this case, there is no creditable evidence *120 in the record of his motive, much less his "dominant motive" in borrowing the $53,000 to complete his $86,000 investment in Goss, Rehart & Co., Inc. See United States v. Generes,405 U.S. 93 (1972). In Imel v. Commissioner,61 T.C. 318, 325 (1973), we held in connection with a contention similar to that made by petitioners in this case, that the mere fact that the person who borrowed funds to purchase stock in a corporation might have anticipated that by the purchase of stock he would obtain for himself an executive position with the corporation did not establish that his primary motive for purchasing shares in the corporation was not to invest in a corporation which he believed had potential. Petitioner relies on Axelrod v. Commissioner,320 F.2d 327 (6th Cir. 1963), revg. 37 T.C. 1053 (1962). In that case the Circuit Court held that where an individual borrowed money to buy out the interest of his partner in a partnership, the proceeds of the loan had been used in that individual's trade or business. In reversing the holding of this Court that the proceeds of the loan had been used for an investment in a partnership *121 interest, the Circuit Court stressed that the acquisition was of a capital interest "in a going non-corporate business in order to preserve its existence" and further stressed that the proceeds of the loan found a "proximate route into the borrower's trade or business * * * as the means for the purchase of a further capital interest in the noncorporate borrower's going business * * *." (320 F.2d at 329). The stress placed by the Circuit Court on the fact that the borrowed funds were invested in a noncorporate business clearly distinguishes the Axelrod case from the instant case. Also, in the Axelrod case the Circuit Court concluded that the borrowed funds had a "proximate" relationship to the borrower's business. Here, no such proximate relationship has been shown.To show such a relationship, petitioners would have to show that Mr. Rehart's dominant motivation in investing the $53,000 in Goss, Rehart & Co., Inc. was to further his own trade or business. United States v. Generes,supra.See also Whipple v. Commissioner,373 U.S. 193 (1963). Petitioners have totally failed to make this showing and therefore have failed to *122 show that they are entitled to a business bad debt deduction under section 166(f). Petitioner's alternative contention is that his guaranty of Mr. Rehart's loan was a debt created or acquired in connection with petitioner's own trade or business and that when he was required to pay as guarantor, the loss from the worthlessness of the resulting indebtedness of Mr. Rehart to him (see Putnam v. Commissioner,352 U.S. 82 (1956)) was incurred in petitioner's trade or business. Petitioner's own testimony in this case is that the $53,000 investment made by Mr. Rehart in Goss, Rehart & Co., Inc. with the proceeds of the loan which petitioners guaranteed would not have been needed except to enable Goss, Rehart & Co., Inc. to engage in over-the-counter sales. Petitioner further testified that he had a broad background in the securities field and that Goss, Rehart & Co., Inc. could have functioned without an active over-the-counter market, as many security firms do. In view of this testimony and petitioner's primary activities with Goss, Rehart & Co., Inc., it is difficult to follow petitioner's contention that his guarantying Mr. Rehart's loan was in any way connected *123 with his obtaining or maintaining employment with Goss, Rehart & Co., Inc. It is clear that the securities business was that of the corporation and petitioner's business was as a corporate officer and securities salesman. There is no evidence here to show that petitioners' guaranty of Mr. Rehart's loan of $53,000 from the United California Bank was with a dominant motive of maintaining his employment with Goss, Rehart & Co., Inc. Petitioners apparently consider the testimony of Mr. Goss that "[from] the beginning, the founder's intent was that of drawing commissions from Goss, Rehart & Co., Inc. Not to building the net worth of the corporation" to support their position that the guaranty of Mr. Rehart's loan was related to Mr. Goss' business of being a corporate officer and securities salesman. Petitioner was president of a securities company with a seat on the New York Stock Exchange and drawing salary and commissions in excess of $136,000 a year at the time Goss, Rehart & Co., Inc. was formed. When this fact is considered, petitioner's testimony of the intent of the founders of Goss, Rehart & Co., Inc. does not "bear the light of analysis." United states v. Generes,supra *124 $3 (405 U.S. at 104). As pointed out in that case-- "* * * an employee-shareholder, in making or guaranteeing a loan to his corporation, usually acts with two motivations, the one to protect his investment and the other to protect his employment." However, in order for the debt to be a business bad debt, the dominant motive of a stockholder-employee of a corporation in making a loan to that corporation must be to protect his own employment. This record totally failed to substantiate that such a motive was petitioners' dominant motive in guarantying Mr. Rehart's loan. See Niblock v. Commissioner,417 F.2d 1185 (7th Cir. 1969), affg. a Memorandum Opinion of this Court. Petitioner argues that the potential of capital gain from Goss, Rehart & Co., Inc. common stock "was remote at best" and points out that in fact the company was declared insolvent by the Securities and Exchange Commission. However, the fact that the company was declared insolvent does not establish tht this was the anticipated result when Goss, Rehart & Co., Inc. was incorporated and commenced business. The record as a whole indicates that the anticipated result at that time was that the *125 corporation would be successful. On the basis of this record as a whole, we conclude that petitioner's motive in investing in Goss, Rehart & Co., Inc. and in guarantying Mr. Rehart's loan for part of his investment in tht corporation was both to establish a successful brokerage firm in which he was the majority stockholder and to establish a firm with corporate policies conducive to a high commission income for its founders. By establishing a firm conducive to such high income to the founders, since only a portion of the commissions went to the stockholder-officer salesmen and the remainder to the corporation, it would follow that a profitable corporation would be established. This record as a whole totally fails to substantiate that petitioner's dominant motive in guarantying Mr. Rehart's loan was to protect his employment with Goss, Rehart & Co., Inc. Such cases as Commissioner v. Moffat,373 F.2d 844 (3d Cir. 1967), affg. a Memorandum Opinion of this Court, which petitioner relies on, are totally distinguishable from the instant case on their facts. Additionally, the Moffat case and all the other cases relied on by petitioner, except the District Court *126 case of Kelson v. United States, an unreported case ( D.C.Utah 1973, 73-2 USTC par. 9565), which was reversed by the United States Court of Appeals for the Tenth Circuit, Kelson v. United States,503 F.2d 1291 (10th Cir. 1974), were decided before the decision of the Supreme Court in United States v. Generes and did not specifically apply the "dominant motive" criteria. Decision will be entered for the respondent. Footnotes
1. The 1969 deficiency resulted from the disallowance of the portion of the previously allowed net operating loss carryback from 1972 to 1969 which arose from the disallowance in 1972 of a claimed business bad debt deduction in the amount of $9,162.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. SEC. 166. BAD DEBTS.
(a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation -- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *
(f) Guarantor of Certain Noncorporate Obligations.--A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.↩