ANTHONY J. DITUNNO, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 13880–81. Filed February 7, 1983.

---

Anthony J. Ditunno, pro se.
*Kristine A. Roth*, for the respondent.

SHIELDS, *Judge*: Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1977 | $1,992.60 |
| 1978 | 2,364.60 |
| 1979 | 787.90 |

Due to concessions, the sole issue for decision is whether petitioner's gambling losses are properly characterized as deductions from gross income under section 62(1)[1] or as itemized deductions under section 63. Resolution of this issue determines whether petitioner is subject to the minimum tax on items of tax preference under section 56 for his 1977 and 1978 taxable years, and whether he is subject to the alternative minimum tax under section 55 for his 1979 taxable year.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioner Anthony J. Ditunno resided in Girard, Ohio, at the time he filed his petition in this case.

Petitioner is a full-time gambler. He has no other profession or type of employment. During the years in issue, he gambled only on horse races at the Waterford Race Track in Newell, W. Va. At the time of trial, he had gambled regularly for about 4 or 5 years.

Petitioner went to the race track 6 days a week, year round. He left for the track at 10 o'clock each morning. He arrived at the track before the races started at 1 o'clock. The races

---

[1] All section references are to the Internal Revenue Code of 1954 as amended during the years in issue, unless otherwise provided.

normally lasted from 1 o'clock until 4:30 o'clock. Petitioner remained at the track until the races were completed.

Petitioner studied racing forms to decide on which races to bet. He did not bet on every race. Instead, he bet mostly on the "doubles" and "trifecta" races.

Petitioner never placed bets on behalf of any other person during the years in issue. He did not sell tips to other gamblers. He never collected commissions for placing bets. He was not a bookmaker.

Other than his winnings from gambling, petitioner had no income during the years 1977 through 1979 except interest of $102.59 in 1979. Each year he reported gambling winnings of approximately $60,000. Each year he also deducted on Schedule C, gambling losses almost equal to his winnings. For 1977, 1978, and 1979, his taxable income was $3,662, $7,254.60, and $6,230.59, respectively.

## OPINION

Section 56, which was effective during 1977 and 1978, and section 55, which was effective during 1979,[2] imposed minimum taxes based on so-called "items of tax preference." If an individual did not have any items of tax preference, he or she was not subject to the minimum tax.

During the years in issue, items of tax preference were defined in section 57(b)(1).[3] Section 57(b)(1) treated many of the

---

[2]Sec. 56 remained a part of the Internal Revenue Code in 1979. However, sec. 57(a)(1) was amended to provide that, for individual taxpayers, adjusted itemized deductions under sec. 57(b)(1) were not to be treated as items of tax preference for purposes of sec. 56. See Pub. L. 95–600, 92–3 Stat. 2763 (1978), for taxable years beginning in 1979. As a result, sec. 56 did not apply to individuals, such as petitioner, beginning in 1979.

[3]During the years in issue, sec. 57(a)(1) described items of tax preference as "an amount equal to [the taxpayer's] adjusted itemized deductions for the taxable year." In 1977 and 1978, sec. 57(b)(1) defined the meaning of the term "adjusted itemized deductions" as follows:

For purposes of paragraph (1) of subsection (a), the amount of the adjusted itemized deductions for any taxable year is the amount by which the sum of the deductions for the taxable year other than—

 (A) deductions allowable in arriving at adjusted gross income,

 (B) the deduction for personal exemptions provided by section 151,

 (C) the deduction for medical, dental, etc., expenses provided by section 213, and

 (D) the deduction for casualty losses described in section 165(c)(3),

exceeds 60 percent (but does not exceed 100 percent) of the taxpayer's adjusted gross income for the taxable year. [As amended by Pub. L. 95–30, 91 Stat. 126 (1977), for taxable years beginning after Dec. 31, 1976, and prior to amendment by Pub. L. 95–600, 92 Stat. 2763 (1978), for taxable years beginning before Jan. 1, 1979.]

deductions allowable under the Internal Revenue Code as items of tax preference.[4] However, it did not include the deductions allowable under section 62 in computing adjusted gross income.

Section 62 defines "adjusted gross income" as gross income minus certain deductions. The deductions from gross income which are relevant to this case are the trade and business deductions specified in section 62(1) as follows:

(1) TRADE AND BUSINESS DEDUCTIONS.—The deductions allowed by this chapter (other than by part VII of this subchapter) which are attributable to a trade·or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee.

A taxpayer whose only deductions were those allowable under section 62 was not subject to the minimum tax of section 56 or 55.[5]

---

Sec. 57(b)(1) was amended in 1978 and, for taxable years beginning in 1979, defined "adjusted itemized deductions" as follows:

For purposes of paragraph (1) of subsection (a), the amount of the adjusted itemized deductions for any taxable year is the amount by which the sum of the itemized deductions (as defined in section 63(f)) other than—
 (A) the deduction for State and local taxes provided by section 164(a),
 (B) the deduction for medical, dental, etc., expenses provided by section 213,
 (C) the deduction for casualty losses described in section 165(c)(3), and
 (D) the deduction allowable under section 691(c),
exceeds 60 percent of the taxpayer's adjusted gross income reduced by the items in subparagraphs (A) through (D) for the taxable year. [As amended by Pub. L. 95–600, 92 Stat. 2763 (1978), for taxable years beginning in 1979.]

[4]For ease of discussion, we will refer to the *deductions* involved in the computation of the amount of adjusted itemized deductions under sec. 57(b)(1) as "items of tax preference." See *supra* note 3.

[5]In the recently enacted Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97–248, sec. 201(a), 96 Stat. 411, Congress once again restructured the minimum tax. Like the pre-TEFRA minimum tax provisions, the post-TEFRA minimum tax base excludes, by definition, the trade or business deductions allowable under sec. 62(1) in computing adjusted gross income. Sec. 55(a); sec. 201(a), 96 Stat. 411. In addition, deductions for wagering losses under sec. 165(d) which are not allowable under sec. 62(1) in computing adjusted gross income are nonetheless excluded from the post-TEFRA minimum tax base by sec. 55(e)(1)(A). The language of sec. 55(e)(1) specifically excludes "any amount allowable as a deduction for the˙taxable year (other than a deduction allowable in computing adjusted gross income) under—(A) section 165(a) for losses described in subsection (c)(3) or (d) of section 165." Sec. 55(e)(1); sec. 201(a), 96 Stat. 411. (The parenthetical language of sec. 55(e) prevents a double deduction from the minimum tax base for those deductions which are allowable in computing adjusted gross income.) Thus, under TEFRA, the non-trade-or-business gambler who itemizes his gambling loss deductions is entitled to the same protection from the minimum tax which was made available to the trade-or-business gambler, whose gambling losses were deductions allowable in computing adjusted gross income, under the minimum tax provisions prior to TEFRA.

Petitioner contends that his gambling losses were deductions from gross income, allowable in computing adjusted gross income. In particular, petitioner asserts that his gambling losses were trade or business deductions, qualifying as deductions from gross income under section 62(1). Accordingly, petitioner argues that his gambling losses were not items of tax preference for purposes of computing the minimum tax.

Respondent contends that petitioner was not in the trade or business of gambling. As a result, he argues that petitioner's gambling loss deductions did not qualify under section 62 as deductions from gross income allowable in computing adjusted gross income. Instead, he maintains that petitioner's gambling loss deductions constituted items of tax preference. Thus, respondent asserts that petitioner was subject to the minimum tax during the years in issue.

## *Judicial Construction of Section 162*

Respondent determined that petitioner was not in the trade or business of gambling based upon this Court's decision in *Gentile v. Commissioner*, 65 T.C. 1 (1975). The taxpayer in *Gentile* depended solely upon his gambling winnings to support a family of five. He claimed that he was not in the trade or business of gambling for purposes of the self-employment tax, section 1401.[6] We agreed with petitioner.

We defined carrying on a trade or business to be "that which 'involves holding one's self out to others as engaged in the selling of goods or services.'" In this definition, we adopted language used by Justice Frankfurter in his concurrence in *Deputy v. du Pont*, 308 U.S. 488, 499 (1940). We found that when the taxpayer in *Gentile* made his bets, he did not hold himself out as offering either goods or services. Therefore, we concluded that he was not in the trade or business of gambling.

Upon reconsideration, we find that the *Gentile* test, which focuses on the provision of goods and services, is overly restrictive. The proper test of whether an individual is

---

[6]Sec. 1402(c) provided that the term "trade or business" had the same meaning as when used in sec. 162.

carrying on a trade or business requires an examination of all the facts involved in *each* case.[7] *Higgins v. Commissioner*, 312 U.S. 212 (1941); *United States v. Pyne*, 313 U.S. 127 (1941); *City Bank Farmers Trust Co. v. Helvering*, 313 U.S. 121 (1941). Although the Court in these cases specifically interpreted section 23(a) of the 1939 Code,[8] the predecessor of section 162, that interpretation also applies to the words "trade or business" as used in section 62. Section 62 was derived from section 22(n), which was added to the Code in 1944.[9] Section 22(n) explicitly defined trade or business deductions as "the deductions *allowed by section 23* which are attributable to a trade or business carried on by the taxpayer." (Emphasis added.) Thus, the judicial construction of section 23(a) "trade or business" deductions also applies to section 62.

When the Supreme Court decided the leading case of *Higgins v. Commissioner, supra*, several different judicial interpretations of the words "carrying on a trade or business" existed.[10] The Third Circuit, in *Du Pont v. Deputy*, 103 F.2d 257 (3d Cir. 1939), had looked to the dictionary for a definition and concluded that "business" meant "that which busies or engages time, attention or labor as a principal serious concern or interest; any particular occupation * * * for livelihood or gain." Although the Supreme Court reversed this Third Circuit judgment in *Deputy v. du Pont*, 308 U.S. 488 (1940), before deciding *Higgins*, it did so without considering the meaning of trade or business.[11]

The Sixth Circuit, in *Kales v. Commissioner*, 101 F.2d 35 (6th Cir. 1937), relied on the case of *Flint v. Stone Tracy Co.*, 220 U.S. 107, 171 (1911). In *Flint*, the Supreme Court defined business to be a very comprehensive term, embracing everything about which a person could be employed, and as that which occupied time, attention, and labor for the purpose of livelihood or profit.

---

[7]Although we mentioned the facts and circumstances test in *Gentile*, we applied the goods and services test as an additional, necessary criterion to the finding of carrying on a trade or business.

[8]I.R.C. 1939, ch. 1, sec. 23(a), 53 Stat. 12.

[9]Individual Income Tax Act of 1944, ch. 210, sec. 8, 58 Stat. 231, 235.

[10]The Court granted certiorari in *Higgins* due to a conflict among the Circuit Courts. *Higgins v. Commissioner*, 312 U.S. 212, 215 (1941).

[11]This was the case in which Justice Frankfurter's concurring opinion appeared.

Finally, the Second Circuit, in *Higgins v. Commissioner*, 111 F.2d 795, 796–797 (2d Cir. 1940), stated that the popular meaning of trade or business controlled its statutory meaning. After examining the facts before it, the Second Circuit gave a negative definition of carrying on a trade or business: "By the common speech of men, a person who does nothing beyond looking after his own investments and receiving the income from them is not conducting a trade or business." The Circuit Court then concluded that the taxpayer, Mr. Higgins, was not in a trade or business, and asserted that this result was "in line with the concurring opinion of Mr. Justice Frankfurter in *Deputy v. du Pont.*"

The Supreme Court, in *Higgins*, examined the meaning of "carrying on a trade or business" not only against a backdrop of differing interpretations by the Circuit Courts, but also in light of the diverse arguments advanced by the Government and the taxpayer. The Government urged the Court to hold that "mere personal investment activities never constitute carrying on a trade or business." The taxpayer, Mr. Higgins, urged that "elements of continuity, constant repetition, regularity and extent" controlled.

Despite this background, the Supreme Court, in *Higgins*, spent little time discussing the myriad existing interpretations of "carrying on a trade or business." It noted that the *Flint* test, *supra*, was not controlling precedent because that case answered a different inquiry under a different statute, the Corporation Tax Act of 1909. Then, the Court succinctly set forth a facts and circumstances test as follows:

> To determine whether the activities of a taxpayer are "carrying on a business" requires an examination of the facts in each case. * * * The Bureau of Internal Revenue has this duty of determining what is carrying on a business, subject to reexamination of the facts by the Board of Tax Appeals and ultimately to review on the law by the courts on which jurisdiction is conferred. [*Higgins v. Commissioner*, 312 U.S. at 217–218. Fn. ref. omitted.]

The facts in *Higgins* showed that Mr. Higgins had a considerable fortune invested in real estate, bonds, and stock. Mr. Higgins sought and made permanent investments. However, limited shiftings occurred in his portfolio due to changes, redemptions, maturities, and accumulations. Mr. Higgins also hired a staff to assist him in overseeing his fortune. The staff kept records, collected securities, dividends and interest, made

deposits, and forwarded reports to Mr. Higgins. The Supreme Court reviewed these facts and observed that, in substance, Mr. Higgins and his staff merely kept records of his investments and, through managerial attention, collected interest and dividends. The Court then concluded, no matter what the size of an estate or the staff required to oversee it, the mere keeping of records and collecting regular payments was not carrying on a trade or business, as a matter of law. Thus, in *Higgins*, the Supreme Court set forth a test of fact and circumstance by which "carrying on a trade or business" was to be measured, and also established that no particular fact or set of facts was sufficient, by itself, to satisfy that test.

The decision in *Higgins* was soon followed by *City Bank Farmers Trust Co. v. Helvering, supra*, and by *United States v. Pyne*, wherein the Supreme Court reiterated that "determination of what amounts to carrying on business requires examination of the facts in each case." 313 U.S. at 129. In *Pyne*, an executor had "conserve[d] the estate by marshalling and gathering the assets as a mere conduit for ultimate distribution." 313 U.S. at 132. In *City Bank*, the sole activities of the trustees of a trust were collecting interest, clipping coupons, and making a very few reinvestments, and the trusts "existed merely to hold and conserve property and distribute the income received." 313 U.S. at 125 n. 4. The Supreme Court held that the facts and circumstances test also applied to executors of an estate and to trustees of a trust. Then, based on records almost identical to the one in *Higgins*, the Supreme Court concluded that the facts in *City Bank* and in *Pyne* were insufficient to establish the carrying on of a trade or business.

When this Court decided *Gentile v. Commissioner, supra*, we applied Justice Frankfurter's goods-and-services test to determine whether the taxpayer was carrying on a trade or business. However, Justice Frankfurter's interpretation of carrying on a trade or business appeared in a *concurring* opinion to *Deputy v. du Pont, supra*. The majority in that case did not consider the meaning of trade or business. In addition, 1 year after deciding *Deputy v. du Pont*, the Supreme Court, in *Higgins*, considered the meaning of carrying on a trade or business, and failed to use Justice Frankfurter's test but adopted, instead, a different test which requires consideration of all the facts in each case.

In *Gentile*, we suggested that Justice Frankfurter's interpretation of carrying on a trade or business had received approval by the Supreme Court in *Snow v. Commissioner*, 416 U.S. 500 (1974). However, the Court, in *Snow*, neither affirmed nor adopted Justice Frankfurter's goods-and-services test. Rather, it merely quoted his language for comparative purposes.

The issue, in *Snow*, was the meaning of "trade or business" as used in section 174, which covers research and development deductions. The Supreme Court, in *Snow*, felt that section 174 should be interpreted expansively, and should not be limited by other restrictive definitions of trade or business which had been suggested for other sections of the Code. As an example of a restrictive test, the Supreme Court noted the goods-and-services definition which had been sketchily outlined by Justice Frankfurter. It then observed:

The words "trade or business" appear, however, in about 60 different sections of the 1954 Act. Those other sections are not helpful here because Congress wrote into §174(a)(1) "in connection with," and §162(a) is more narrowly written than is §174 * * * [Thus, that] and other sections are not helpful here. [*Snow v. Commissioner*, 416 U.S. at 503. Fn. ref. omitted.]

Thus, the *Snow* reference to Justice Frankfurter's concurrence in *Deputy v. du Pont* does not indicate that the Supreme Court intended to reconsider *Higgins* or to approve his definition. Accord *Grosswald v. Schweiker*, 653 F.2d 58, 61 n. 3 (2d Cir. 1981).

Numerous lower courts have applied the facts and circumstances test laid down in *Higgins* in determining what constitutes carrying on a trade or business. See, e.g., *Commissioner v. Moffat*, 373 F.2d 844, 846 (3d Cir. 1967); *Walsh v. Commissioner*, 313 F.2d 389, 391 (4th Cir. 1963); *United States v. Keeler*, 308 F.2d 424, 428 (9th Cir. 1962); *Green v. Commissioner*, 74 T.C. 1229, 1235 (1980); *Redwood Empire Savings & Loan Association v. Commissioner*, 68 T.C. 960, 971 (1977), affd. 628 F.2d 516 (9th Cir. 1980). Furthermore, the application of the *Higgins* test by the lower courts on a case-by-case basis has also shown that failure to provide or offer goods and services to others is not sufficient by itself to find that a taxpayer is not carrying on a trade or business.[12] See, e.g., *Main Line*

---

[12]This is clearly the view in the Sixth Circuit, to which this case is appealable.

*Distributors, Inc. v. Commissioner,* 321 F.2d 562, 565 (6th Cir. 1963), affg. 37 T.C. 1090 (1962); *Commissioner v. Wiesler,* 161 F.2d 997 (6th Cir. 1947), affg. 6 T.C. 1148 (1946); *Liang v. Commissioner,* 23 T.C. 1040 (1955); *Moller v. United States,* 2 USCCR No. 3, Nov. 19, 1982 (J. White). See also *Snyder v. Commissioner,* 295 U.S. 134 (1935); *City Bank Farmers Trust Co. v. Commissioner,* 112 F.2d 457, 459 (2d Cir. 1940), affd. 313 U.S. 121 (1941). In most of these cases, the taxpayer involved was an investor who traded solely on his or her own account and offered no goods or services to others.

From the above review of the judicial history of what constitutes a trade or business, we now believe that our focus on a goods-and-services test in *Gentile v. Commissioner,* 65 T.C. 1 (1975), was misplaced. Accordingly, *Gentile* will no longer be followed.[13]

### *Application of the Facts-and-Circumstances Test*

To decide whether petitioner was in the trade or business of gambling within the meaning of section 62(a), we must look to the facts on the record.[14] First, we note that petitioner was not a passive investor like the taxpayers in *Higgins, Pyne,* and *City Bank.* The taxpayers in those cases invested their moneys in stable and relatively permanent portfolios which required little activity except the collection of interest and dividends. By contrast, the petitioner in this case gambled most of the day, on a daily basis. He went to the track 6 days each week,

---

[13]Our adoption of the goods-and-services test in *Gentile* was consistent with our opinion in *Barrett v. Commissioner,* 58 T.C. 284, 288 (1972); therefore, *Barrett* will also not be followed in the future to the extent that it holds that the offering of goods or services is essential to the conduct of a trade or business.

[14]Congress was evidently surprised at the result in *Higgins,* as the following discussion in the Congressional Record makes clear:

"Trade or business has received such a narrow interpretation that many meritorious deductions are denied. The Supreme Court, in the case of *Higgins v. Commissioner* (312 U.S. 212 (1941)), held that expenses in connection with a taxpayer's investments in income-producing properties were not deductible, on the ground that making casual investments was not a trade or business. Since the income from such investments is clearly taxable it is inequitable to deny the deduction of expenses attributable to such investments. [88 Cong. Rec. 6376 (1942).]"

By enacting sec. 212, the Congress intended to restore meritorious deductions which *Higgins* denied, not to narrow further the meaning and scope of carrying on a trade or business under sec. 162.

and the track was open year round. He placed bets almost every day, and concentrated on the doubles and trifectas. In sum, petitioner was an active gambler, devoting his full time to gambling activities.

In addition, petitioner's activity did not consist simply of collecting interest and dividends as they accrued or were declared. Instead, petitioner studied papers and racing forms before he placed his bets, and concentrated on certain types of tickets. He constantly took risks in placing his bets, on which he was not assured of a return. While petitioner used his own money to gamble solely on his own account, this fact is not sufficient to preclude petitioner from being in a trade or business. *Main Line Distributors, Inc. v. Commissioner, supra; Liang v. Commissioner, supra.*

After considering all the facts in the record, we are convinced that petitioner was in the trade or business of gambling within the meaning of section 62(1). Accordingly, his gambling losses constitute deductions allowable in computing adjusted gross income, and are not items of tax preference.

To reflect concessions by petitioner,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

TANNENWALD, *Chief Judge*, dissenting: I respectfully dissent from the action of my colleagues in the majority, who, I suggest, have allowed their hearts to prevail over their minds in order to alleviate the arguably inequitable application of the minimum tax to full-time gamblers like petitioner. The action of the majority will wreak havoc on the concept of trade or business which, although not defined in either the Internal Revenue Code or the regulations, has, of necessity, developed over time through the judicial process. In overruling *Gentile v. Commissioner*, 65 T.C. 1 (1975),[1] and rejecting the well-established guideline that to carry on a trade or business one must generally "[hold] one's self out to others as engaged in the

---

[1] The potential for havoc is increased by the fact that respondent has acquiesced in *Gentile*. See 1980–2 C.B. 1–2, and particularly n. 39.

selling of goods or services" (*Deputy v. du Pont*, 308 U.S. 488, 499 (1940) (Frankfurter, *J.*, concurring)), the majority ignores both the nature of the facts-and-circumstances test and a long-accumulated body of case law.

At the risk of being charged with self-anointment, I disagree with the majority's conclusion that *Gentile* should be over-ruled. In so concluding, the majority cavalierly, and I believe incorrectly, relegates to the ash can the standard articulated by Justice Frankfurter in his concurring opinion in *Deputy v. du Pont, supra*. Admittedly, the Supreme Court, itself, has accorded that opinion confusing treatment. See *Helvering v. Wilmington Trust Co.*, 124 F.2d 156, 158–159 (3d Cir. 1941), revd. on other grounds 316 U.S. 164 (1942). But the fact of the matter is that the holding-out test has been repeatedly emphasized by the courts as an essential ingredient of carrying on a trade or business. *Snow v. Commissioner*, 416 U.S. 500, 502–503 (1979); *Grosswald v. Schweiker*, 653 F.2d 58, 59–60 (2d Cir. 1981); *McDowell v. Ribicoff*, 292 F.2d 174, 176–177 (3d Cir. 1961); *Green v. Commissioner*, 74 T.C. 1229, 1235 (1980); *Gestrich v. Commissioner*, 74 T.C. 525, 529 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982); *Barnett v. Commissioner*, 69 T.C. 609, 613 (1978); *Gentile v. Commissioner, supra*; *Barrett v. Commissioner*, 58 T.C. 284, 290 (1972);[2] *Fischer v. Commissioner*, 50 T.C. 164, 171 (1968).[3] To be sure, that ingredient was not referred to by the Supreme Court in *Higgins v. Commissioner*, 312 U.S. 212 (1941). The foundation of the Supreme Court's decision, however, was that the trial court had found as a fact that the taxpayer was not engaged in a trade or business in the context of the test of "sufficient extent, continuity, variety and regularity" (see 312 U.S. at 216) and that such finding should not be disturbed. Such being the case, there was no need for the Supreme Court to advert to the holding-out test. The same analysis is applicable to the Supreme Court's disposition of *United States v. Pyne*, 313 U.S.

---

[2] It is significant that, in criticizing this Court's decision in *Barrett* (see *Grosswald v. Schweiker*, 653 F.2d 58, 60–61 (2d Cir. 1981)), the Second Circuit Court of Appeals emphasized the holding-out test and merely disagreed with us that the test should not be applied where only one third party was involved.

[3] See also *Steffens v. Commissioner*, T.C. Memo. 1981–637; *Syracuse v. Commissioner*, T.C. Memo. 1981–340; *Curran v. Commissioner*, T.C. Memo. 1970–160.

127 (1941), and *City Bank Farmers Trust Co. v. Helvering*, 313 U.S. 121 (1941).[4] Nor do I believe that *Snow v. Commissioner*, *supra*, can be readily dismissed. It is true that, in that case, the Supreme Court used Justice Frankfurter's holding-out language only for comparative purposes. But the fact of the matter is that the Court found it necessary to select a standard for comparing section 162 with section 174 and, in so doing, selected Justice Frankfurter's holding-out test.[5] If this does not constitute approval, I do not know what does.

The majority states on page 370 that courts have "shown that failure to provide or offer goods and services is not sufficient by itself to find that a taxpayer is not carrying on a trade or business." I know of no case (and my research has not produced any) where a taxpayer did not deal with third parties, i.e., hold himself out, and was nevertheless found to be carrying on a trade or business. The cases relied upon by the majority to support its statement are simply not in point. They all involved issues relating to tax treatment of dealers, traders, and investors in securities.[6] It is important to realize that in such situations (which include the situations involved in *Higgins*, *Pyne*, and *City Bank* (see pp. 373–374 *supra*)) there are dealings with third parties—the principal issue is whether those dealings rise to the level of entitling the taxpayer to qualify as a dealer as against a trader or investor in securities.

---

[4]It should also be noted that the majority in *Deputy v. du Pont*, 308 U.S. 488 (1940), found it unnecessary to discuss the holding-out test because it assumed that the taxpayer was engaged in a trade or business. See 308 U.S. at 493. Indeed, it was this very assumption that sparked Justice Frankfurter's concurring opinion.

[5]The majority's quotation from *Snow* conveniently omits the following pertinent language, which immediately precedes the language in the majority opinion:

"Section 174 was enacted in 1954 to dilute some of the conception of "ordinary and necessary" business expenses under §162(a) (then §23(a)(1) of the Internal Revenue Code of 1939) adumbrated by Mr. Justice Frankfurter in a concurring opinion in *Deputy v. Du Pont*, 308 U.S. 488, 499 (1940), where he said that *the section in question* (old §23(a)) *'involves holding one's self out to others as engaged in the selling of goods or services.'* [*Snow v. Commissioner*, 416 U.S. 500, 502–503. Emphasis added.]"

[6]In two of the four cases directly relied upon by the majority (*Main Line Distributors* and *Liang*), the taxpayer was, in fact, found *not* to be carrying on a trade or business. In one (*Wiesler*), the respondent conceded the issue and this Court specifically stated that, in light of this fact, it did not have to reach the holding-out question (see *Wiesler v. Commissioner*, 6 T.C. 1148, 1154 (1946), affd. 161 F.2d 997 (6th Cir. 1947)). Only in *Moller* was the taxpayer found to be carrying on a trade or business without reference to the holding-out test, but I observe that, in point of fact, the taxpayer's selling activities involved extensive dealings with third parties. *Snyder v. Commissioner*, 295 U.S. 134 (1935), also cited by the majority, is simply not in point and, in any event, preceded the Supreme Court's decision in *Higgins*.

See *Wilson v. United States*, 179 Ct. Cl. 725, 743–746, 376 F.2d 280, 291–293 (1967); *Kemon v. Commissioner*, 16 T.C. 1026 (1951).

As I see it, the proper view of existing case law, which was applied by this Court in *Gentile v. Commissioner, supra*, is that holding oneself out is an essential but not necessarily sufficient ingredient of carrying on a trade or business. Indeed, I believe that the opinions of the Supreme Court in *Higgins*, *Pyne*, and *City Bank* confirm this view. I would therefore hold that petitioner herein is not carrying on a trade or business. I now turn to the question of the applicability of the minimum tax to petitioner in light of this conclusion.

For petitioner to avoid minimum tax liability in the instant case, his gambling losses must be deductible either as trade or business deductions under section 62(1) or otherwise as deductions netted against gambling winnings before determining adjusted gross income.

For the reasons previously given, I am convinced that these losses do not meet the test of above-the-line deductibility under section 62(1).[7] For reasons given below, I would also reject the netting approach.

I have examined the extensive legislative history of the minimum tax provisions, which have been amended on numerous occasions since they were first enacted in 1969, and have found nothing to indicate that Congress intended to depart from the apparent treatment of gambling losses as deductions from gross income to arrive at adjusted gross income where a trade or business was involved, and as itemized deductions from adjusted gross income where a trade or business was not involved.[8] Indeed, in the very recently enacted Tax Equity and Fiscal Responsibility Act of 1982, Congress specifically provided without comment that gambling losses could be taken as a deduction from "adjusted gross

---

[7]Sec. 62(1) provides as follows:

For purposes of this subtitle, the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions:

 (1) TRADE AND BUSINESS DEDUCTIONS.—The deductions allowed by this chapter * * * which are attributable to a trade or business carried on by the taxpayer * * *

[8]See generally Joint Committee Explanation, 1976–3 C.B. (Vol. 2) 1, 118, in which it is stated that "Medical and casualty deductions are excluded from this preference item because they are limited to expenses that are beyond the control of the taxpayer."

income" for purposes of the minimum tax (Pub. L. 97–248, sec. 201(a), 96 Stat. 324, 414; H. Rept. 97–760 (Conf.) 475 (1982). Such legislative action confirms the rejection of the "netting" approach in terms of statutory construction. See note 12 *infra*.

Nor can I find any basis for imposing a judicial gloss on the applicable statutory provisions in order to adopt petitioner's "netting" approach. Prior to 1934, when there was no specific provision governing the deductibility of gambling losses, the Board of Tax Appeals adopted the "netting" approach. Thus, in *McKenna v. Commissioner*, 1 B.T.A. 326 (1925), a professional gambler's, i.e., bookmaker's, gross income, as defined in section 213(a) of the Revenue Act of 1918, was limited to the aggregate of his receipts less disbursements to bettors, or his "actual" gain. Netting was extended to calculating the casual gambler's gross income in *Frey, Executor v. Commissioner*, 1 B.T.A. 338 (1925).

In 1934, Congress enacted the provision which later became the present section 165(d): "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." Since that time, the courts have, with the exception of *Winkler v. United States*, 230 F.2d 766 (1st Cir. 1956), consistently rejected the "netting" approach and treated gambling winnings as gross income and gambling losses as itemized deductions, subject to the statutory limitation that such losses could not exceed such winnings. E.g., *McClanahan v. United States*, 292 F.2d 630, 631–632 (5th Cir. 1961); *Winkler v. United States*, *supra* at 775–776; *Johnston v. Commissioner*, 25 T.C. 106 (1955).[9]

Petitioner, herein, has not raised any constitutional arguments but relies solely on his position that he was carrying on a trade or business which entitled him to deduct his gambling losses (up to the amount of his winnings) from gross income in arriving at adjusted gross income for purposes of the minimum tax. It appears, therefore, that this case is not an appropriate one for dealing with the constitutional questions raised by the First Circuit's opinion in *Winkler v. United States*, *supra*. I observe, however, that, in that case, the taxpayer was a bookmaker and clearly satisfied the holding-out test. As such,

---

[9]See also *Heidelberg v. Commissioner*, T.C. Memo. 1977–133; *Carter v. Commissioner*, T.C. Memo. 1976–23.

and in view of the regularity and continuity of his activities, he was carrying on a trade or business and it was in this context that the First Circuit considered the taxpayer a "professional gambler" and analyzed the constitutional implications involved in gambling activities.[10] Having concluded, as I have, that petitioner was not engaged in a trade or business, I also conclude that he does not fit the categorization of a professional gambler.[11] It seems clear that there is no constitutional barrier to according different treatment—at least where deductions or credits are concerned—to taxpayers who are engaged in a trade or business and those who are not. *High Plains Agricultural Credit Corp. v. Commissioner*, 63 T.C. 118, 127 (1974). To the extent that *Frey, Executor v. Commissioner, supra,* implies that a taxpayer who is not a professional gambler, i.e., a gambler carrying on a trade or business, should be entitled to net his losses in determining adjusted gross income, I would no longer follow it.

In sum, although the application of the minimum tax to petitioner appears harsh, I believe that *Gentile* represents sound law and that the applicable statutory provision is clear, with the result that respondent should prevail herein.[12]

STERRETT, CHABOT, and COHEN, *JJ.*, agree with this dissenting opinion.

---

[10]See also *Pedone v. United States*, 138 Ct. Cl. 233, 151 F. Supp. 288, 291 (1957); *Sullinger v. Commissioner*, 11 T.C. 1076 (1948).

[11]Moreover, the record herein is silent as to petitioner's commitment to losses which the First Circuit considered of critical importance. See *Winkler v. United States*, 230 F.2d 766, 774 (1st Cir. 1956).

[12]Had Congress intended gambling losses to be deductible in determining tax-preference items, either it would have said so in 1976, as it did in 1982, or it would have made the 1982 change effective for prior years. See *Buttke v. Commissioner*, 72 T.C. 677, 680–681 (1979), affd. per curiam 625 F.2d 202 (8th Cir. 1980).