ARNOLD BARRISH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrish v. Commissioner
Docket Nos. 11020-81, 8746-82.
United States Tax Court
T.C. Memo 1984-602; 1984 Tax Ct. Memo LEXIS 65; 49 T.C.M. (CCH) 115; T.C.M. (RIA) 84602; November 20, 1984. *65 Held: Petitioner's activity of gambling on the dog races in Colorado constituted a trade or business and he is entitled to deduct from his winnings the amounts he bet on the races and his expenses related thereto in arriving at adjusted gross income from that activity. Amounts of profit from gambling on the dog races determined. Michael Abromovitz, for the petitioner. Mark Howard, for the respondent. DRENNEN MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge. In these consolidated cases respondent determined deficiencies in petitioner's income taxes for the years 1979 and 1980 in the amounts of $42,810.00 *66 and $308,886.70, and additions to tax under section 6653(a) [1] of the Internal Revenue Code in the amounts of $2,140.50 and $15,444.33, respectively. The principle issue is whether petitioner's activities involved in gambling on dog races constituted a trade or business. FINDINGS OF FACT The stipulated Findings of Fact are incorporated herein by reference.Petitioner was unmarried and a resident of Denver, Colorado, at the time of filing the petitions in these cases. Petitioner filed individual Federal income tax returns with the Internal Revenue Service for the years 1979 and 1980. On his tax returns for 1979 petitioner stated his occupation to be "Attorney/Handicapper;" on his 1980 return it was stated to be "Attorney/Greyhound Racing Wagerer." On his 1979 return petitioner reported his gross income from practicing law on a Schedule C as $38,150, and deductions relevant to his law practice totalling $17,600, for a net profit from this business of $20,550. Petitioner also reported onanother Schedule C attached to his 1979 return total income *67 from "Greyhound Handicapping" in the amount of $24,100, [2] with deductions for expenses for car, travel and entertainment, periodicals, and programs and admissions totalling $3,727, for a net profit from this business of $20,373. A schedule was attached identifying the net winnings from handicapping as follows: Net winnings
Interstate Kennel Club #1
$4,000 Cloverleaf Kennel Club
11,100 Mile High Kennel Club
19,000 Rocky Mtn. Kennel Club
(6,000)
Interstate Kennel Club #2
(2,500)
Florida Tracks
(1,500)
$24,100 In his notice of deficiency for 1979 respondent determined that petitioner had gambling winnings from the above dog racing tracks in the amount of $143,751, less the $24,100 reported, or $119,651, allowed a deduction for expenses for the production of gambling income in the amount of $200, and a deduction for additional sales tax of $285, and allowed a standard deduction of $1,000. Respondent determined the total tax due to be $42,810 plus the negligence addition of $2,140.50 against which was allowed taxes withheld of $15,768. [3]
*68 Prior to filing his 1980 return petitioner was advised that he should report his gross income from gambling and deduct his costs as cost of operations. Consequently, on his 1980 return petitioner reported gross receipts from his legal practice of $50,600, less itemized deductions relative to the legal practice of $14,076 for a net profit from this business of $36,524. On his Schedule C for racing he reported $433,100 as gross receipts, $460,000 as "cost of operations" for a total loss of $26,900, less itemized deductions for transportation, entertainment and admissions, etc. in the amount of $2,773 for a net reported loss from this source of $39,673. [4] The tax computed on his adjusted gross income of $6,851 was $580 plus self employment tax of $555, against which he claimed txes withheld of $5,971.95, resulting in an overpayment of $4,836.95. In his notice of deficiency for 1980, respondent disallowed the $460,000 claimed as cost of operations and the $2,773 claimed as expenses for the production of gambling income all allowed a standard deduction of $1,000 which, together with the adjusted gross income reported, resulted in a corrected adjusted gross income of $468,624, *69 the tax on which was determined to be $310,021.70. After reducting this by the $1,135 of tax reported on the return, the deficiency in tax was determined to be $308,886.70. Respondent accepted petitioner's reported gross income from gambling but disallowed the costs claimed on the return because "gambling is not considered a trade or business (refer to the Alfred A. Gentile case, 65 T.C. 1 * * *)." Petitioner grew up in the Bronx in New York City, graduated from the New York public school system and City College of New York, was accepted at Harvard Law School which he attended and graduated in the upper third of his class in 1967. Thereafter he returned to the Bronx for awhile, then joined VISTA in California for two years. He moved to Denver, Colorado, in 1973 and became associated with the Divine Light Mission, an Indian order, and lived in a monastery operated by the order. To be of some legal assistance to the order, petitioner studied for the Colorado bar exam *70 and was admitted to practice law in Colorado in 1974. He opened a law office in Denver in 1975 and also drove a taxicab for awhile, living in various rooming houses. He law practice consisted of a few personal injury cases which were not very remunerative. In February of 1976 petitioner started going to a dog racing track in the vicinity of Denver. His first time out he won $750 and the second time he won $500. He knew very little about dog racing but thought this was a better way to make a living than practicing law. As time went on petitioner spent more time at the race tracks and studying racing forms and less time in his law office, although his personal injury law practice did grow. While petitioner had very few assets and lived quite frugally, he became a chronic attendee and bettor at the race tracks. He made an effort to attend every dog racing program at each of the four dog tracks in the Denver area which scheduled their meetings to run consecutively with no overlap. Each of the four Colorado tracks is open approximately 71 nights per year.They also have some matinee programs. Petitioner bought numerous tickets on almost every race on the days he attended, *71 betting primarily on quinellas, [5] twin-quinellas, [6] and tri-fecta [7] races. At times he won rather sizable amounts and at other times he lost rather heavily. When he was losing, he borrowed money from friends, his secretary, a bank and the race tracks. When he won he always paid his debts. Prior to 1979 petitioner's custom was to go to his law office for about three hours in the mornings, then spend about four hours either in his office or at the track studying racing forms and other more sophisticated records of the racing dogs, and watching reruns of the races in which his favorite dogs had run. Petitioner also cultivated dog trainers and owners to get first hand information on the physical condition *72 and peculiarities of the dogs he would be betting on. Petitioner believed that he had to see every race in which a dog had run in order to properly handicap the dog. The balance of petitioner's day was spent going to and from the tracks and watching or betting on the races. By 1979 petitioner had developed a system of betting on the tri-fectas and twin-quinellas that he thought was bound to win unless he had very bad luck or judgment. The odds against winning were quite high but petitioner decided that if he could pick the winner in the tri-fecta race, he could buy tickets on that dog in combination with most all of the other dogs in the race and have a pretty good chance of cashing a winning ticket. On a twin-quinella race if he could pick the winner of the first race he could buy tickets on that dog in combination with most all the other dogs in the race (called "boxing") and have a good chance of qualifying for the second race. Then if he could pick the winner of the second race, he could box that dog with all the other dogs in the race and have a sure winner. During 1979 and 1980 petitioner bet primarily on the twin-quinellas and tri-fectas in this manner, although at times *73 he bet in a more customary way. Petitioner's system required buying a large number of tickets on each race, and petitioner would often occupy a sales window the entire time between races to buy his tickets. He often bought so many tickets on one race that he could not hold them all. Petitioner's system for betting on the twin-quinellas and tri-fectas also guaranteed that he would buy a large number of losing tickets at $2 per ticket. Approximately 15 percent of the total amounts wagered at the Colorado dog racing tracks is withdrawn off the top by the race track; one-third goes to the State for taxes, two-thirds goes to the track. This results in smaller pools for those holding winning tickets to divide. Petitioner did not keep written records of the amounts he bet or won, or the amounts of his winnings and losses. He kept a running account in his mind of the amounts he bet and the amounts he won or lost on each day's betting activities. At the end of a day he mentally added his winnings or subtracted his losses from betting that day to his running account at the end of the previous day and in this manner was able to estimate his total net winnings or losses during *74 a meeting of each of the tracks during a year. On his 1979 return petitioner reported the net gain from all his dog race betting during the entire year, recalled in this manner. Petitioner occasionally jotted down on a racing form or some other document he was consulting at the time, his running totals for the day or year up to that time, but these figures were not permanently recorded. On his 1980 return petitioner reported as gross income from betting the amounts of his winnings as reflected on the W-2G forms issued to him and the IRS by the race tracks where he cashed winning tickets. He estimated his cost of betting by adding to his reported winnings the net loss for the year reflected in his running mental accounting described above. Petitioner claimed as expenses of transportation for both 1979 and 1980 the number of days he attended the races multiplied by the roundtrip mileage to and from the tracks, multiplied by the standard rates for operating automobiles. He claimed as cost of admissions the number of days he attended the races multiplied by the cost of admission to each track and used the same method for estimating his cost of racing forms and other information *75 documents. He also estimated the amounts he spent on entertaining various dog owners and trainers and others to obtain information about the dogs. During 1979 petitioner spent more time on dog betting and less time at his law office. In the early part of 1980 petitioner moved to Loveland, Colorado to be nearer the Cloverleaf track and avoid the daily 60 mile roundtrip drive from and to Denver. Shortly thereafter he went to Florida for six days to attend a church meeting, and brought back with him a client that had a large personal injury claim that petitioner was employed to collect. This required a good bit of petitioner's time so he was not able to devote as much of his time to dog racing as usual. While petitioner's income from his law practice increased, he began losing rather consistently at the dog tracks. He decided that his losses at the tracks were due to his inability to spend adequate time gathering information about the dogs and watching them run, and that he would either have to curtail his law practice or give up betting on the races. He chose to do the former so he farmed out his legal work on a percentage basis and spent more time at the tracks and *76 in his office handicapping the dogs. He spent as much as four to six hours a day searching through all the information he could get on the dogs and handicapping them on the basis of that information. He also increased his gambling activities but he did not do very well and had to borrow money from his friends, associates, and the tracks to keep going. He became indebted to one of the tracks for about $7,000 which he couldn't pay off until 1981 when his luck took a turn for the better. Petitioner lived rather frugally. He lived in rented rooms with very few furnishings. He had very few clothes and ate meagerly. He did not travel much except in connection with his religious group. He did not entertain except for people at the tracks whom he thought might be helpful. He did not keep much monmey in banks or elsewhere, and his net worth was quite small or negative at times. A check spread analysis does not show large, unexplained movements of money, nor did the evidence suggest that petitioner had large hordes of cash. Petitioner has apparently been more successful in gambling on the dog races in years subsequent to 1980 and was still spending most of his time in *77 that activity at the time of trial. On his 1979 return petitioner reported gross receipts from his law practice of $38,150 and expenses related to his law practice of $17,600, for a net profit of $20,550 from his law practice. He reported net income from greyhound handicapping of $24,100 with expenses related to that activity of $3,727, for a net profit of $20,373. He also claimed itemized deductions totaling $11,416 (including $10,432 for charitable contributions), and he reported $15,792 of Federal income tax withheld. Based on these figures, petitioner had out of pocket expenditures during 1979 totaling $48,535 in addition to his living expenses, and exclusive of the amounts he bet on the races which presumably were included in his calculation of net income from greyhound handicapping. On his 1980 return petitioner reported cost of operations (or cost of betting) in the amount of $460,000 and $2,773 as expenses related to greyhound racing. He also reported expenses related to his law practice totaling $14,076. He did not claim any itemized deductions but he did report $5,971.95 as Federal income tax withheld. Based on these figures petitioner had out of pocket expenditures *78 in 1980 exclusive of living expenses, in the amount of $482,820.95. In 1979 petitioner's reported source of funds to pay his out of pocket expenditures ($48,535) and living expenses (estimated to be $15,000) was $38,150 from his law practice and $24,100 net income from gambling. Thus his out of pocket expenses could be estimated to be $63,535 and his source of funds $62,250. In 1980 petitioner's reported source of funds to pay his out of pocket expenditures (exclusive of repayment of loans) was $433,100 of gross receipts from the dog races and $50,600 of gross receipts from his law practice. Thus his out of pocket expenses could be estimated to be $497,820.95 (including $15,000 estimated for living expenses) and his source of funds $483,700. Petitioner was in the trade or business of gambling on dog races in the years 1979 and 1980. OPINION The first issue is whether petitioner's activities in wagering on the greyhound races was a trade or business within the meaning of section 62(1). The term "trade or business" is nowhere defined in the Internal Revenue Code nor have the courts settled on a universally acceptable definition. Several cases have in recent years *79 considered whether gambling strictly for one's own account constitutes a trade or business. The conclusions have been mixed because the courts have applied different tests to determine whether a taxpayer's activities constitute a trade or business. The position of this Court was very recently announced in Groetzinger v. Commissioner,82 T.C. 793 (1984), on appeal, 7th Cir., a Court reviewed opinion, affirming the test adopted by this Court in Ditunno v. Commissioner,80 T.C. 362 (1983), (appeal dismissed by 6th Cir. 1983), and followed by this Court in Gajewski v. Commissioner,T.C. Memo. 1983-133, revd. 723 F.2d 1062 (2d Cir. 1984). That test was stated to be "The proper test of whether an individual is carrying on a trade or business requires an examination of all the facts involved in each case." In reversing and remanding this Court in Gajewski v. Commissioner,supra, the Second Circuit adopted a different test which is that in order to be engaged in a trade or business, "a taxpayer must, as a minimum have held himself out to others as offering goods or services." [8] With due respect *80 to the Second Circuit, we adhere to the test we first espoused in Ditunno v. Commissioner,supra, and reasserted in Groetzinger v. Commissioner,supra.[9]
Thus the first issue herein boils down to whether on the facts established in this case petitioner's activities related to gambling on the dog races constituted carrying on a trade or business. We have concluded that they did. Prior to 1976 petitioner had attempted to earn a living practicing law and driving a taxicab, although not too successfully. In 1976 he was lucky the first time he went to *81 the dog races and came out ahead. He decided that it was easier to make a living betting on dog races than practicing law so he started spending more time at the race tracks. During the years 1977 and 1978 he went to his law office most mornings but spent the afternoons and evenings at the race tracks and learning how to handicap dog races. He bought racing forms and other publications that contained information and records on all the dogs that were racing at the Colorado tracks. He watched the dogs run and observed how they performed under varying conditions, which he thought he had to know to correctly handicap the dogs. He attended the races almost every day they were running in Colorado and he bet on most of the races. By the beginning of 1979 petitioner had devised a system of betting on the tri-fecta and twin-quinella races, which are the high odds races, which he thought would assure him of cashing winning tickets. The system required that he have correct information on every dog in the race and it also required him to bet large amounts on each race. In 1979 and early 1980 petitioner concentrated on this type of betting and spent very little time at his law office. He went *82 to Florida in April of 1980 and made the acquaintance of individual who had a large personal injury claim. Petitioner took this individual back to Colorado with him and for awhile concentrated on this client's legal affairs and did not attend the races on an every day basis. He started losing at the races and decided he would have to give up either his law practice or betting on the races. He chose to do the former and during the latter part of 1980 he again concentrated on the dog races and spent very little time in his law office. Petitioner did not keep written records of his gambling income and expenses but kept a running record in his mind of his current gain or loss. For 1979 he determined that he had won a net of over $20,000 from racing that year. For 1980 petitioner determined that he had a net loss from racing in the amount of slightly less than $30,000 although he did have some good winnings near the end of the year. Petitioner continued to attend and bet on the races during 1981 and 1982 and he determined that he had net gains from racing in those years. While the failure to keep records of his gambling winnings and losses and expenses does not suggest *83 a business-like approach to that activity, we do not believe it necessarily means that petitioner was not in the business of gambling. We feel relatively certain that petitioner knew at any given time during the year about where he stood financially as a result of his betting activities. We also believe from petitioner's testimony and his manner of betting that he believed he could make a profit from gambling on the dogs. While the race track employees who testified indicated that very few inveterate gamblers win in the long run at the tracks, most gamblers are incorrigible optimists. In order to qualify as a trade or business an activity must be carried on with an objective for profit, but the test is not the reasonableness of the taxpayer's belief that profit will be realized but whether the enterprise is carried on in good faith and for the purpose of making a profit. Doggett v. Burnet,65 F.2d 191 (D.C. Cir. 1933). The amount of time petitioner spent on handicapping the dogs and the manner in which he went about it justified his belief that he was one of the few who would come out ahead. [10]
*84 The facts in this case are very similar tothose in Ditunno, wherein we found that the taxpayer was in the business of gambling, except that in Ditunno the taxpayer had no other occupation while here petitioner did conduct a law practice. However, it is clear that a taxpayer may be in two trades or businesses. Alverson v. Commissioner,35 B.T.A. 482 (1937); Curphey v. Commissioner,73 T.C. 766 (1980). Furthermore, the facts indicate that in 1979 and 1980 gambling was petitioner's principle business and the practice of law was secondary. When he had to make a choice on which to concentrate in 1980 he chose gambling. Petitioner was not a mere investor in dog racing. With considerable regularity he went to the race tracks to bet on the dogs and to observe how they ran under varying conditions. His betting involved numerous risks. He acquired information about the dogs he bet on from publications he bought, his own personal observations, and from talking to the owners and handlers of the dogs. He spent many hours most of the days the tracks were open studying the information he had obtained and applying it to determine which *85 dogs he would bet on, and buying tickets to implement his system. There was continuity, repetition, and sustained activity on petitioner's part in gambiling on the dog races. We conclude that this constituted a trade or business in the years before us. We also find respondent's argument that petitioner's only objective in betting on the dogs was to obtain money to continue betting to be ludicrous. Since petitioner's betting on dog racing was a business, he is entitled to deduct from his gross income from that activity his costs and expenses directly related to that activity to arrive at his adjusted gross income therefrom. Section 62(1), Ditunno v. Commissioner,supra;Winkler v. U.S.,230 F.2d 766 (1st Cir. 1956). This includes the amounts he bet on the races and the expenses he incurred in conducting the activity, such as expenses incurred in buying publications, admissions, etc. [11] We must therefore determine the amount of petitioner's gross income from gambling, i.e., the winning tickets he cashed, and the amounts he bet on the races. *86 Respondent determined that petitioner'sgross income, or winnings, were the amounts reported by the race tracks on the W-2G forms issued to petitioner by the tracks for the year 1979, and the amount of gross income reported by petitioner on his return for 1980. Petitioner does not deny that he received those amounts as gross income so there is no dispute as to gross income from gambling, although both parties suggest that petitioner's gross income from gambling may have exceeded the amounts reported on the W-2G forms. The main bone of contention is how much it cost petitioner in bets to produce that gross income. Respondent determined that petitioner had only $200 of costs to produce the gambling income in 1979. For 1980 respondent determined that petitioner had no costs in producing the gambling income. Respondent's determinations are presumed to be correct except to the extent they can be shown to be excessive or wrong, Welch v. Helvering,290 U.S. 111 (1933), or unless they can be shown to be arbitrary and without rational foundation. United States v. Janis,428 U.S. 433 (1976). Petitioner kept no record of his gambling income *87 or expenditures so he cannot prove by evidence, or with any specificity, wherein respondent's determination of his gambling costs was wrong. However, reason alone convinces us that petitioner could not have won $143,751 by purchasing at the most only 100 $2 tickets, and the evidence clearly shows that petitioner purchased many more tickets than 100 each day he was at the races and sometimes more than that on each race he bet on. It is also completely unreasonable to charge petitioner with gambling income of $468,624 with absolutely no cost of producing it. Perhaps, since petitioner had no records, respondent's determination should not be considered arbitrary or capricious, but we think accepting respondent's determinations in this instance would be taxing petitioner's failure to keep records rather than his taxable income. We find no reasonable or rational foundation for respondent's not allowing any deductions for amounts bet by petitioner. Respondent apparently made no effort to determine what happened to the huge amounts petitioner collected on his bets through a net worth computation, bank deposits, or a cash expenditures analysis. Respondent may not normally *88 be required to make such analysis, but it would have been very helpful to both respondent and this Court in determining petitioner's correct tax liability had he done so. If we are to give any weight to the evidence we received at the trial, it is clear that petitioner must have either buried his purported winnings, gave them away, or bet them on the races. Numberous friends and business acquaintances of petitioner testified with respect to petitioner's activities, standard of living, life style, and visible assets. These were bankers, lawyers, track officials, and employees who testified voluntarily, and we found no reason not to believe their testimony. It was made clear that petitioner lived hand to mouth in rented rooms, that he had very little furniture and very few clothes, that he had only a rundown 1975 automobile, that he did not eat or drink expensively, and that he spent very little money for pleasure. He was not married and had no children or relatives to support. Despite respondent's arguments to the contrary petitioner did not travel extensively for pleasure. He was constantly borrowing money from his friends, business associates and banks. His bank *89 accounts did not reflect any unexplained movements of sizable amounts of cash. There is no evidence that petitioner acquired any assets other than those he required for living and conducting his legal and gambling activities. There would appear to be little, if any, growth in his net worth during the years before us. An analysis of petitioner's known and estimated cash expenditures, as reflected on his tax returns, and in the evidence, other than for betting on the races, suggests that petitioner's cash expenditures were about equal to the cash available to him from the transactions reported on his returns. As related in our findings of fact, which assumed that petitioner spent $15,000 in cash each year for living expenses, petitioner spent about $1,250 more than his reported income for 1979; in 1980 he spent about $14,000 more than his reported income. The above minute analysis of petitioner's net worth and cach expenditures, without further explanations or suggestions from respondent, together with what we consider to be the implausability of respondent's determination, convinces us that respondent's determinations in the notice of deficiency cannot be presumed *90 to be correct. This does not mean, however, that respondent must bear the burden of proving what petitioner's taxable income actually was. It simply means that the Court must make such a determination based on all the evidence presented.We are convinced that petitioner had considerably more gambling expenditures than allowed him by respondent and he should be given credit for them, Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). However, the uncertainty of the amounts of such expenditures results from petitioner's failure to keep records and we will bear heavily on petitioner in estimating those expenditures. In light of petitioner's knowledge of the dogs he bet on and the race tracks on which they ran, the time he spent each day studying the racing forms and watching the dogs run, the type of races he bet on, and the system he used to be relatively sure of a winner in many of the races he bet on, and his consistency in attending the races and betting on them almost every day the tracks were open, and keeping in mind that he testified he came out ahead on the races in 1979, 1981, and 1982, we believe petitioner won on the races in both of the years 1979 and *91 1980. We also conclude that his net winnings were more than he reported on his returns. Doing the best we can on the meager evidence we have before us, we conclude that petitioner spent $110,000 in 1979 to win the $143,751 he is charged with winning, giving him a net income from gambling of $33,751. The Schedule C expenses totaling $3,727 claimed on the return, less the $2,957 travel expenses disallowed, are included in the $110,000 of expenditures so his adjusted gross income from gambling in 1979 was also $33,751. We conclude with respect to 1980 that petitioner spent $400,000 to win the $433,100 gambling income he is charged with winning, giving him a net income from gambling of $33,100. The Schedule C expenses totaling $2,773, less the $2,213 travel expenses disallowed, are included in the $400,000 of expenditures so his adjusted gross income from gambling in 1980 was also $33,100. Petitioner conceded that the addition to tax for negligence under section 6653(a) is applicable to any deficiencies that may finally be determined. Petitioner also concedes that he is liable for the self employment tax on his net earnings from the business of gambling. [12] *92 Decision will be entered under Rule 155.
Footnotes
1. All Code references are to the Internal Revenue Code of 1954, as amended, prior to and during the years here involved.↩
2. This was a net income figure. There was no breakdown of winnings and cost of betting. ↩
3. The small discrepancy in the amount of taxes withheld claimed on petitioner's return and the amount allowed in the notice of deficiency is not explained.↩
4. The two figures actually totalled $29,673 instead of $39,673. However, the correct figure was apparently used in determining net business income and adjusted gross income reported.↩
5. To win a quinella a bettor must select the dogs which come in first and second but the order does not matter. ↩
6. To win a twin-quinella a bettor must select two dogs out of eight dogs racing in two consecutive races that will finish first or second in either order. The bettor must win the first race to qualify to bet on the second race. ↩
7. To win a tri-fecta the bettor must pick the first three finishers out of eight dogs racing in the exact order of finish.↩
8. On the opening day of its term starting in October of 1984, the Supreme Court denied certiorari in Gajewski.See also, Estate of Cull v. Commissioner, (6th Cir. Oct. 23, 1984,     F.2d    , 54 AFTR2d 84↩-6169) revg. this Court and adopting the "goods or services" test. 9. Our reasons for so doing are explained in our opinion in Groetzinger v. Commissioner,82 T.C. 793, and the cases cited and discussed therein, and need not be repeated here. See also Wells v. Commissioner,T.C. Memo 1981-507↩ (Sept. 24, 1984).
10. Respondent's argument that petitioner's claimed loss on gambling in 1980 is proof that petitioner was not in gambling to make a profit is rather inconsistent with his determination that petitioner had net taxable income from gambling in 1980 in the amount of $433,100.↩
11. Since petitioner's principal business was betting on the dogs, his principal place of business must have been the race tracks where he bet. He is therefore not entitled to a deduction for his travel expenses between his home and the race tracks because this was commuting expense. Since petitioner testified that he computed the travel expenses claimed on his returns by multiplying the roundtrip mileage between his home and the tracks by the number of days he attended the tracks, multiplied by the standard rates for operating automobiles, and since we have no evidence to break down the amounts claimed by petitioner for car and track expenses and travel and entertainment expenses, we must disallow the entire amounts claimed on the returns for those items, although a part of the travel may have been between petitioner's law office and the tracks. The amounts disallowed are $2,957 ($1,637 and $1,320) for 1979 and $2,213 ($1,313 and $900) for 1980.↩
12. After the conclusion of this trial respondent raised the point that if the Court found that petitioner was not in the trade or business of gambling, any deductions allowed petitioner for bets made on the races would only be deductible as itemized deductions and thus would be preference items under sec. 57 of the Code and subject to the alternative minimum tax under sec. 55 of the Code. Petitioner objected to this on the ground that it was raised too late. We agree with petitioner and have not considered the point. Furthermore, since we have found petitioner to be in the trade or business of gambling, his costs of gambling are deductible from gross income, and the point becomes moot.↩