DONALD L. MEREDITH and MARY LOU MEREDITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Meredith v. Commissioner
Docket No. 29146-82.
United States Tax Court
T.C. Memo 1984-651; 1984 Tax Ct. Memo LEXIS 20; 49 T.C.M. (CCH) 318; T.C.M. (RIA) 84651; December 18, 1984. Michael J. Abramovitz, for the petitioners. Byron Calderon, for the respondent. SWIFT MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated September 14, 1982, respondent determined deficiencies of $10,895.00 for 1978 and $15,447.00 for 1979 in petitioners' Federal income tax liabilities. By way of an amendment to answer filed with the Court on August 17, 1984, respondent asserted increased deficiencies which bring the total deficiencies determined *22 to $18,330.00 for 1978 and $20,154.00 for 1979. The issues for decision are: (1) whether petitioner, Donald L. Meredith, was engaged in the trade or business of gambling during 1978 and 1979, and (2) whether petitioners are entitled to deduct, under section 162(a), [1] certain travel, lodging and other miscellaneous expenses. [2]
FINDINGS OF FACT Some of the facts are stipulated and are so found. Petitioners Donald L. Meredith and Mary Lou Meredith resided in Northglenn, Colorado, at the time their petition *23 was filed. Although Mary Lou Meredith participated in the gambling activities described herein to a limited extent, subsequent references to "petitioner" refer to Donald L. Meredith. Petitioners timely filed joint Federal income tax returns for the years 1978 and 1979. They subsequently filed a timely joint amended Federal income tax return, Form 1040X, with respect to the year 1978. Pursuant to a valid agreement executed by petitioners' representative and by respondent, the period in which to assess additional tax with respect to the year 1978 was extended until December 31, 1982, in accordance with the provisions of section 6501(c)(4). During the years in issue, petitioner was a full-time gambler. He had no other outside employment, and except for the closing down of his candy business (which business incurred an overall loss of $2,122 for the year 1978 and which business only involved a few hours of work each week during the first few months of 1978), petitioner engaged in no business and received no income from sources other than gambling in 1978 and 1979. During the years in issue he placed bets primarily on greyhound races within the Colorado racing circuit. *24 In addition, he would sometimes bet on horse races at a nearby horse racing track and would, on less frequent occasions, play poker and bet on the outcome of selected sporting events. On the Colorado dog racing circuit, the greyhound races are scheduled so that they are held in a particular city (such as Colorado Springs, Colorado, or Loveland, Colorado) for several months and then move on the another city in Colorado. All of the races held in one city are referred to as a "meet", and one meet typically lasts ten weeks. During a meet in a particular city, races are held six nights per week with additional matinee and "schooling" races. All of the races held on a single day are referred to as a "program." Each program normally consists of twelve or thirteen races, and lasts approximately four hours. In 1978 and 1979, petitioner attended all of the approximately 60 programs held at each of the five dog racing tracks which were operated in Colorado, with the exception of the track operated in Pueblo, Colorado. Petitioner estimated that he only attended five or six programs at the Pueblo meets in 1978 and 1979. In addition to time at the racetrack, petitioner would *25 spend approximately seven or eight hours per day during the first three weeks of a meet studying racing forms and other information that was available pertaining to the greyhounds scheduled to race in the meet in that city. During the remaining seven weeks of a meet, petitioner would reduce the time he spent studying the greyhounds to one or two hours each day there was a program. Petitioner would always drive to the race track at which races were being held from his home in Northglenn, Colorado, and return home following the completion for each program. Our calculations (based on the above facts) indicate that petitioner went to the greyhound races approximately 245 days each year, attended at least 245 racing programs, observed and had the opportunity to place wagers on approximately 2,940 separate races and, in fact, did place numerous wagers on many if not most of those races. The total time petitioner spent each year at the races was approximately 980 hours. Time spent each year studying the greyhounds' racing records was approximately 672 hours. Thus, between study time and race track time, petitioner spent an estimated 41 forty-hour work weeks in 1978 and 1979 *26 engaged in his betting activities. Petitioner generally preferred to bet within the "quinella" and "trifecta" pools. In order to share in the winnings of the "quinella" pool, the bettor must correctly select the first two dogs to finish, in any order. In order to share in the winnings of the "trifecta" pool, the top three finishers must be selected in the correct order. Sometimes petitioner would bet in the "twin quinella" pool, in which the successful bettor would have to choose the top two finishers in two consecutive races in order to win. Petitioner's strategy generally was to pick a favorite or "key" dog and then to bet most of the other dogs in combination with the favorite dog. Petitioner would normally bet only with his own money. Occasionally, however, he would allow certain friends, as an accomodation to them, to put up some of their money for petitioner to use in placing bets, in return for which the friends would receive a corresponding percentage of the profits or losses realized from all bets made by petitioner on all races of the program that day. In such circumstances, petitioner always determined how to make the bets. He did not sell tips or other *27 information to other bettors, nor was he a bookmaker. Some of the bets, although not a high percentage, were made by Mary Lou Meredith, the wife of Donald, and also a petitioner in this case. On occasion, she would also sign the required receipt for winnings received. Throughout the years in issue, petitioner kept records of his gambling transactions in the following manner. Upon arriving home from the track each day, petitioner would record separately the net results for each gambling activity (namely, dogs, horses, sports and/or poker) that he engaged in on that particular day. [3] For example, his records reflect an entry for January 3, 1979 as follows: "Dogs + 4,207." Thus, petitioner's records do not enable him to determine what the gross winnings were each day, what the total amount spent on wagers was each day, nor the results of any one race. Only the net "plus" or "minus" for each day for a given activity can be determined.Petitioner's records indicate that for 1978, he realized a net total of $314,449.70 in "winnings" on "winning" days, and a net total of $269,659.00 in "losses" on "loss" days, for a net gain for the year of $44,790.70. In 1979 (which was *28 the only year from 1973 through 1980 for which petitioner had an overall loss), the records indicate net "winnings" of $294,611.80 on "winning" days and net "losses" of $310,933.00 on "loss" days, for a net loss for the year of $16,321.20. On their joint Federal income tax returns, petitioners deducted $5,050.00 in 1978 and $3,959.00 in 1979 for automobile expenses in connection with the gambling activities, which deductions are in dispute herein. Also disputed are deductions of $474 for travel and $88 in lodging for 1978 (representing the costs of a trip to Las Vegas), as well as a miscellaneous deduction of $300 in 1978 for programs, seats and forms. OPINION The first issue for decision is whether petitioner was engaged in the trade or business of gambling during the years 1978 and 1979. Petitioner claims that he was engaged in the business of gambling and therefore *29 that his gambling losses do not trigger the minimum tax under section 56 for 1978 and the alternative minimum tax under section 55 for 1979 because gambling losses do not fall within the definition of tax preference items. [4] Respondent contends that petitioner's activities did not constitute a trade or business on the grounds that gambling for one's own account does not constitute a trade or business. In Ditunno v. Commissioner,80 T.C. 362 (1983), we held that a taxpayer who devoted an extraordinary amount of time to wagering on dog races with the intent of earning a living from such activity and who had no other employment during the year was engaged in the trade or business *30 of gambling even though he gambled solely for his own account. In so holding, we expressly overruled Gentile v. Commissioner,65 T.C. 1 (1975), in which we had followed the proposition that in order to be engaged in a trade or business, one must hold one's self out to others as offering goods or services. That proposition or test had its origin in Justice Frankfurter's concurring opinion in Deputy v. duPont,308 U.S. 488 (1940). Relying primarily upon Higgins v. Commissioner,312 U.S. 212 (1941), we substituted a "facts and circumstances" approach, under which the elements of contrinuity, regularity and extent of a taxpayer's activities will control. Subsequent to our Ditunno opinion, both the Second Circuit in Gajewski v. Commissioner,723 F.2d 1062 (2d Cir. 1983) and the Sixth Circuit in Estate of Cull v. Commissioner,746 F.2d 1148 (6th Cir. 1984), rejected our "facts and circumstances" standard and held that the legal standard of "holding one's self out to others as engaged in the selling of goods and services" must be satisfied in determining whether one is engaged in a trade *31 or business. The Sixth Circuit, in Estate of Cull,supra, attempted to explain the harmony between the two standards as follows: Higgins stands for the proposition that determining whether one is involved in a trade or business is a question of fact while the Frankfurter concurrence in duPont, sets forth a minimum standard for establishing taxpayers' involvement in a trade or business. (84-2 USTC Par. 9878 at 85,671, 54-2 AFTR 2d 84-6169, 84-6172). Respondent acknowledges our holding in Ditunno, but urges that we reevaluate our position, particularly in light of the Gajewski opinion, supra, and that we reject what respondent refers to as the "nontest" of "facts and circumstances." We did recently reevaluate our position on this matter in Groetzinger v. Commissioner,82 T.C. 793 (1984), a Court reviewed opinion, and we decline to do so again here. After an extensive review of the case law concerning this issue, we concluded that we would continue to follow Ditunno, and we noted as follows: We think *32 that the very inability to distill from the case law a precise test or definition of a "trade or business" supports our conclusion that the question is inherently one of fact, as the Supreme Court announced in Higgins. As one court stated: "The term 'trade or business' appears in the Tax Code in over sixty places and by necessity must obtain of a functional definition according to the context in which the question arises." Steffens v. Commissioner,707 F.2d 478, 482 (11th Cir. 1983). (82 T.C. at 800.) and further-- We are unable to discern any meaningful distinction between the so-called "active trader" of securities and the full-time gambler such as petitioner in this case. The essential nature of these activities is identical; to state it simply, one gambles on stocks, the other on dogs. Both bet, or trade, solely for their own account and do not enter into any transactions with specific individuals; rather, their profits or losses depend solely upon their *33 ability to predict outcomes in an impersonal and (presumably) nonmanipulatable market or parimutuel event. (82 T.C. at 801-802.) The facts in the instant case are similar to those in Ditunno and Groetzinger. Petitioner devoted long hours to his gambling activities, and looked to gambling as the sole means of supporting himself and his family. The fact that petitioner herein incidentally gambled on additional events, including sports, poker, and horse racing, in addition to dog racing, is not significant. The fact that 1979 was petitioners' only losing year over a period of eight years (1973-1980) is testimony to his expertise. We conclude that petitioner's activities were sufficiently regular, frequent and substantial to constitute a trade or business. Consequently, he may deduct his gambling losses as trade or business expenses, and petitioner is not subject to the minimum tax. Respondent also argues that petitioners' records were not of sufficient quality or completeness that one would expect of a professional. We note that the petitioner's records in this case do not differ appreciably from those kept by the taxpayer in Groetzinger, *34 who "[a]t the end of each day, or sometimes after each performance, * * * recorded his net winnings or net losses in a journal." 82 T.C. at 794. Respondent asserts that it is improper for petitioners to "net" wins and losses of each day prior to recording them. While we agree that it would be preferable to record all wins separately and to compute all expenses of the bets made, either way, petitioners' tax liability is the same. See Green v. Commissioner,66 T.C. 538 (1976). As previously explained, respondent also has challenged travel and miscellaneous expenses, all of which petitioners claim related to his gambling business. Petitioners deducted automobile expenses of $5,050.00 and $3,959.00 on their respective 1978 and 1979 Federal income tax returns. Those automobile expenses represented the cost of driving to and from the various race tracks during those years. Respondent has disallowed those deductions in their entirety, on the sole ground that petitioners have failed to adequately substantiate the expenses, pursuant to section 274(d). [5]
*35 The testimony at trial was that in calculating the automobile business expense deduction for 1978, petitioner's accountant multiplied 40,000 miles (an estimate given to him by petitioner of the number of miles traveled in connection with the business) by the standard mileage rate deduction (apparently 17 cents for the first 15,000 miles, and 10 cents per mile for the excess), resulting in a $5,050 deduction. For 1979, although the record is not entirely clear, petitioner's accountant apparently multiplied 26,840 miles (a figure derived from petitioner's estimate that 50% of the miles traveled by his automobile during the year were for business purposes) by the standard mileage rate in effect for that year (18.5 cents for the first 15,000 miles and 10 cents for miles in excess of $15,000.) At trial, petitioner testified as to the estimated distances of each racing track from his home, and also to the number of times that he would visit each track in a year. Whenever petitioner testified to a range with respect to the number of trips made to a particular track per year, we have adopted the lower figure. Those estimated figures are set forth as follows: Race Track
Round Trip
Number of
Total
Location
Distance to Home
Trips Per Year
Miles
Byers
120 miles
60
7,200
Loveland
85 miles
60
5,100
Colorado Springs
180 miles
60
10,800
Commerce City
30 miles
60
1,800
Pueblo
260 miles
5
1,300
Centennial (horse track)
50 miles
15
750
TOTAL
26,950
*36 We note that we are here dealing with local transportation and thus the rules of section 274 do not apply. We find petitioner's testimony and estimates to be reliable. In, addition, the numerous receipts petitioner offered into evidence entitled "Statement for Certain Gambling Winnings" constitute corroborating evidence, certainly to establish petitioner's presence at the race tracks on numerous occasions. We find that there is sufficient evidence to invoke the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), and we estimate, bearing heavily upon the taxpayer whose inexactitude is of his own making, that petitioners traveled 27,000 miles in pursuit of their business activities both in 1978 and 1979. The standard mileage rate allowed by respondent in 1978 was 17.5 cents per mile for the first 15,000 miles and 10 cents for miles in excess of 15,000. Rev. Proc. 77-40, 1977-2 C.B. 574. Those figures applied against 27,000 miles produces an allowable deduction for 1978 of $3,750, and we so hold. The standard mileage rate deduction allowed by respondent in 1979 was 18.5 cents per mile for the first 15,000 miles and 10 cents per *37 mile for miles in excess of that amount. Rev. Proc. 80-7, 1980-1 C.B. 590. Those figures applied against 27,000 miles would produce a deduction of $3,975.00 for 1979. However, petitioner has claimed a lesser amount of $3,959.00 for 1979, and we therefore allow that amount. Petitioners deducted $300 on their 1978 Federal income tax return for "programs, seats, forms" in connection with their gambling activities. Respondent disallowed that amount in its entirety for lack of substantiation. Petitioner testified that he paid $75 for his seat at the Cloverleaf race track in Loveland, Colorado and an additional, although unspecified, amount for his seat at the Mile High race track in Commerce City. He also testified that the cost of a daily program at each track was 75 cents, but that he frequently obtained programs for free. He also testified that he spent a minimum of $5 per day for admission, for automobile parking and to purchase a program when attending the horse races (which, he testified, he attended fifteen to twenty times per year). We find petitioner's testimony to be reliable and his estimate reasonable. We allow petitioners the $300 deduction *38 claimed. Petitioner deduction $474 for airplane fares and $88 in lodging in connection with a trip that petitioners made to Las Vegas in 1978. Respondent agrees that those expenses are substantiated, but has disallowed them on the basis that no business purpose for the trip has been established. Deductible traveling expenses are those which are reasonable and necessary to the conduct of a taxpayer's business, profession or employment and are directly attributable thereto. Sec. 1.162-2(a), Income Tax Regs. Also, if a trip is primarily personal in nature, no traveling expenses attributable thereto are deductible. Sec. 1.162-2(b), Income Tax Regs. Petitioner has not established a business purpose for the trip. We therefore disallow the expenses of the Las Vegas trip in their entirety. In accordance with the resolution of the issues set forth above, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. ↩
2. At trial, respondent orally indicated that he wished to raise as an alternative issue petitioners' liability for self-employment taxes. The Court instructed respondent to raise any new issue in an amended pleading. Although respondent subsequently filed an amended answer that alleged an increased deficiency, he did not raise the the issue of petitioners' liability for self-employment taxes. We therefore do not consider the issue. See Rules 39 40 and 41, Tax Court Rules of Practice and Procedure.↩
3. The daily entries made with respect to dog and horse racing activities were also "net" of the amounts of winnings withheld by the particular track. However, petitioner kept a separate record of the amounts withheld, and would add the total amount withheld to his winning figures at the end of each year.↩
4. If petitioner is found not to be engaged in the trade or business of gambling, his gambling losses would be characterized as itemized deductions, and could only be deducted to the extent of the gains from gambling transactions. Section 165(d). If he is found to be engaged in the trade or business of gambling, the losses can be deducted as trade or business expenses under section 62, which are excluded from the definition of tax preference items under the statutory scheme.↩
5. Section 274(d) provides in relevant part that: (d) Substantiation Required. -- No deduction shall be allowed-- (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home), * * * unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating his own statement (A) the amount of such expense or other item, (B) the time and place of the travel, entertainment, amusement, recreation, or use of the facility, or the date and description of the gift, (C) the business purpose of the expense or other item, and (D) the business relationship to the taxpayer of persons entertained, using the facility, or receiving the gift. The Secretary may be regulations provide that some or all of the requirements of the preceding sentence shall not apply in the case of an expense which does not exceed an amount prescribed pursuant to such regulations. No issue was raised by respondent as to whether the automobile expenses were nondeductible commuting expenses.↩